JUDGE SWEET

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Ramon Alberto AREVALO LOPEZ,

*Petitioner*,

Jefferson B. SESSIONS III, in his official capacity as the Attorney General of the United States;  Kirstjen NIELSEN in her official capacity as Secretary of Homeland Security; Thomas DECKER, in his official capacity as New York Field Office Director for U.S. Immigration and Customs Enforcement; James MCHENRY, in his official capacity as Director of the Executive Office  for Immigration Review; and the U.S. DEPARTMENT OF HOMELAND SECURITY,

*Respondents*.

18 CV 4189

Case No. _____

**VERIFIED PETITION FOR WRIT OF HABEAS CORPUS**

1.     Petitioner Ramon Alberto Arevalo Lopez ("Petitioner," "Ramon" or "Mr. Arevalo") is a nineteen-year old high school student in the ninth grade. *See* Exh. 1, School Verification Letter.  At the time of his detention he was 18 years old and had come to the United States to seek safety.

2.     Ramon brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241; the All Writs Act, 28 U.S.C. § 1651; and Article I, Section 9, of the Constitution.

3.     As of the date of this Petition, he has been detained for over 180 days by the Respondents in conditions identical to those of county jail inmates serving criminal sentences.  He has not had the opportunity to challenge his detention before a neutral decision-maker, and he challenges his continued prolonged detention on statutory and constitutional grounds.

4.     Ramon's continued immigration detention violates his statutory and constitutional rights, and he respectfully requests this Court to use its authority under 28 U.S.C. § 2243 to order the government to file a return within three days, or sooner. *See* 28 U.S.C. § 2243 (an order to

1

show cause why a petition for a writ of habeas corpus should not be granted should generally be "returned within three days").

## PRELIMINARY STATEMENT

5.     Ramon entered the United States on December 8, 2016 after fleeing gang threats in his home country. *See* Exh. 2, Application for asylum, withholding of removal under the INA and withholding pursuant to the Convention Against Torture ("Asylum Application").   At the time of Ramon's entry in the  United States he was 17 years old, and properly designated as an Unaccompanied Alien Child ("UAC") by U.S. Customs & Border Protection ("CBP").

6.     Pursuant to the Trafficking and Victims Protection Reauthorization Act ("TVPRA") Ramon  was transferred to the custody of the Office of Refugee Resettlement ("ORR").  *See* 8 U.S.C. 1232(b)(3) and 6 U.S.C. 279.

7.     On January 7, 2017, following the identification of a suitable sponsor, pursuant to the applicable law, ORR released Mr. Arevalo from its custody to his mother, Rosa America Lopez Lopez.  *See* Exh. 3, ORR Verification of Release. For over ten months, he lived with his mother, her partner, and his older brother, Balmore Alexander Reyes Lopez, in  Huntington Station, NY. *See id.*[1]

8.     Ramon was then detained by the Immigration and Customs Enforcement ("ICE") on or about October 24, 2017 at the home of his mother in Long Island, New York.  At the time of his detention by the Respondents he was attending the 9th grade at the Huntington Station High School. *See* Exh. 1, School Verification Letter.

9.     Ramon has *no criminal history and has never been arrested in the United States, or anywhere.*

---

[1] Upon information and belief, the Petitioner's brother who was not represented by The Legal Aid Society, was deported to El Salvador on or about April 29, 2018.

10.     Nonetheless, Ramon is brought to his immigration court hearings in an orange jail jumpsuit with his hands shackled; the Respondents have a blanket policy of refusing to unshackle all immigration detainees during court proceedings, even when those proceedings last several hours.

11.     The Respondents contend that Ramon is subject to mandatory detention because they allege that he is an "arriving alien" under 8 U.S.C. § 1225(b),   and thus does not have the opportunity to seek bond from an Immigration Judge.

12.     On January 30, 2018, Ramon's counsel, Alina Charniauskaya, sent an email to the DHS trial attorney, Mr. Michael McFarland, requesting evidence regarding the determination that Ramon is an arriving alien, his I-213 Record of Deportable/Inadmissible Alien, the reasons for his re-detention, and whether ICE had considered placing Ramon "in the least restrictive setting that is in the best interest of the child" pursuant to the TVPRA. Mr. McFarland never responded to the request. *See* Exh. 4,  Email Correspondence from Counsel for Petitioner to ERO/OCC dated January 30, 2018 ("January 30, 2018 Email to ERO/OCC").

13.     On March 1, 2018, the Immigration Judge agreed with the Respondents' designation of Ramon as an arriving alien and found that the Immigration Court does not have jurisdiction to hold a bond hearing.  Consequently, the Immigration Judge did not evaluate whether the Respondents have any evidence to support Ramon's detention and/or to determine whether his detention is justified on either the basis of his being a danger to the community or flight risk. *See* Exh.  5, Immigration Judge Decision dated March 1, 2018.

14.     On February 27, 2018, Ramon sought release from the Respondents through a parole request. *See* Exh. 6,  Ramon's Parole Request.  However, on March 15, 2018, the Respondents denied Ramon's parole request without any explanation other than to state in a

cursory conclusion that "there is no compelling reason to warrant a favorable exercise of discretion in this case." *See* Exh. 7, Denial of Ramon's Parole Request dated March 15, 2018.

15.     At the time of the Denial of Ramon's Parole Request and as of the date of this Petition, the Respondents have failed to provide any evidence or information to support Ramon's arrest and detention on or about October 24, 2017. He has had no opportunity to contest his detention before a neutral decision-maker.

16.     On or about March 31, 2018, The Legal Aid Society submitted a request for reconsideration of the Denial of Parole Request to ICE's Office of Chief Counsel ("OCC"). *See* Exh. 8, Email Correspondence from Counsel for Petitioner to ERO/OCC dated March 31, 2018. The request for reconsideration detailed the fact that Ramon's detention by ICE resulted in separation from his family and a disruption of his education. The undersigned also set forth that Ramon was released to his mother from ORR custody and that he is seeking multiple forms of relief due to his fear of returning to El Salvador. The undersigned did not receive a response from OCC and therefore sent another request on April 24, 2018. *See* Exh. 7, Email Correspondence from Counsel for Petitioner to ERO/OCC dated April 24, 2018 ("April 24, 2018 Email to ERO/OCC"). . The only response received by the undersigned to date was April 24, 2018 in which the OCC inquired as to whether a habeas petition was pending for Ramon. The undersigned responded that a habeas petition was not pending as of that date and has not received any further response from the OCC. *See id.*

17.     As is detailed below, Ramon is not properly subjected to mandatory detention under 8 U.S.C. § 1225(b), because he is neither an arriving asylum seeker nor an arriving Lawful Permanent Resident ("LPR") (or any other alien seeking admission after previously being admitted). Rather, at the time of his entry, Ramon was a UAC who was placed in ORR custody

and referred for full removal proceedings. Nothing in the text of § 1225(b) states that aliens in this position must be mandatorily detained. An interpretation to the contrary would be unreasonable, unconstitutional, and ultra vires because it is unsupported by the text of § 1225(b), inconsistent with Congressional intent, and would result in prolonged mandatory detention in violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution,

18.     As is also detailed below, Ramon's continued detention violates his Fourth Amendment rights under the U.S. Constitution.  Under the Fourth Amendment prohibition against unreasonable seizures, an arresting officer must have probable cause determination reviewed and confirmed by a "neutral and detached magistrate" either before arrest or promptly thereafter, *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975); *County of Riverside v. McLaughlin,* 500 U.S. 44, 50 (1991) (establishing 48 hours as a default standard for the requirement of a "prompt" probable cause determination).  At no time prior to Ramon's arrest did any neutral or detached judicial officer exercise independent judgment to confirm ICE's assessment that it possessed probable cause to arrest and detain Ramon.  Rather, following arrest and more than 180 days of detention, neither Ramon nor his mother have been able to obtain review of the lawfulness of his seizure despite affirmatively seeking a review in all available administrative venues including before an Immigration Judge and the Respondent's parole process.

19.     Moreover, Ramon's detention violates his fundamental right to family unity and his rights to equal protection under the law.  There is no evidence of probable cause, or of any adequate process provided, to justify the detention of Ramon, intruding into his fundamental interest in liberty, on or about October 24, 2017.  Indeed, Ramon has not been provided with *any* process to challenge his detention that resulted in him being torn from his mother and education. The Respondents' unilateral decision to detain Ramon, without opportunity for review, taking

him from his mother's home and disrupting his educational development violates the Petitioner's Fifth Amendment right to procedural and substantive due process, and equal protection.

20.     As is outlined below,  8 U.S.C. §1232(2)(B) requires that the Respondents, ICE, "shall consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight."  8 U.S.C. §1232(2)(B).

21.     The Respondents' actions in this case and disregard of the requirements of 8 U.S.C. §1232(2)(B) violates the Administrative Procedures Act ("APA" in that ICE's actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" 5 U.S.C. §706(2)(C) and "in excess of statutory jurisdiction, authority or limitations, or short of statutory right," 5 U.S.C. §706(2)(C).  Therefore, the Respondents should be compelled under 5 U.S.C. §706(1) to take the actions it is required to take pursuant to 8 U.S.C. §1232(2)(B).

22.     During the pendency of this Petition, the Court should order the Respondents to immediately release Ramon.  Ramon has been detained more than 180 days  as of the date of this Petition in conditions identical to those of county jail inmates serving criminal sentences.  Ramon has no criminal arrests or convictions *of any kind*.  Despite the fact that Ramon has been detained more than 180 days, the Respondents have failed—despite requests from Ramon's attorneys—to produce or provide any evidence to justify and provide a legal basis for detaining him.

23.     Due to his age and vulnerability, Ramon is suffering irreparable harm in detention.  He is terrified of being in the Bergen County Jail and has been unable to sleep. He is even scared to use the phone to call his mother on the regular basis. His mother, in turn, does not have the ability to visit Ramon because she does have not the financial means to travel from the family home in Long Island to the Bergen County Jail in New Jersey.  *See* Exh. 9, Letter from Patricia Telfort, Social Worker with The Legal Aid Society.

6

24.     Ramon has missed over six months of school.   The Bergen County Jail does not have any facilities for continued education or tutoring.  As such, Ramon cannot continue his education if he remains in custody. The Bergen County Jails does not provide any educational programs for Ramon.  He is not able to attend any classes, participate in any programs in the Jail and therefore has not received any education for over 180 days.

25.     Therefore, he has been now detained for more than *180 days*, has been unable to see or speak with his family, and has been unable to sleep. Ramon has missed over six months of school.  For the sake of his mental health, Ramon should be released from custody immediately.

26.     The Court's authority to release habeas corpus petitioners during the pendency of their petitions is governed by *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001); *see also Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 153 (2d Cir. 2007) (explaining the REAL ID Act of 2005 "did not qualify our inherent authority to admit to bail petitioners in immigrations cases").

27.     Under *Mapp*, "a court considering a habeas petitioner's fitness for bail must inquire into whether 'the habeas petition raises substantial claims and whether extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective.'" *Id.* at 230 (alterations omitted) (quoting *Iuteri v. Nardoza*, 662 F.2d 159, 161 (2d Cir. 1981)).

28.     For the purposes of a *Mapp* inquiry, "the Court considers three factors: (1) whether substantial claims are set forth in the habeas corpus petition; (2) whether the petitioner has demonstrated a likelihood of success on the merits of his or her petition; and (3) whether there are extraordinary circumstances attending the petitioner's situation which would require release on bail in order to make the writ of habeas corpus effective." *Boddie v. New York State Div. of Parole*, No 08 Civ. 9287, 2009 WL 1531595, at *1 (S.D.N.Y. May 28, 2009).

29.     Ramon has suffered many violations of his most sacred and fundamental rights, evidencing both substantial claims, and a likelihood of success.  The harm that Ramon is suffering, to his mental health and to his education, is having a lasting impact on the Petitioner's life.  Given the irreparable harm being caused, Ramon should be immediately released into the custody of his mother pending the resolution of this petition.

30.     As Ramon's continued immigration detention violates his statutory and constitutional rights, this Court should use its authority under 28 U.S.C. § 2243 to order the government to file a return within three days, unless they can show good cause for additional time.  *See* 28 U.S.C. § 2243 (order to show cause why a petition for a writ of habeas corpus should not be granted should be "returned within three days unless for good cause additional time, not exceeding twenty days, is allowed").

## PARTIES

31.     Petitioner, Ramon Alberto Arevalo Lopez,  is 19 years old and entered the United States on December 8, 2016 after fleeing gang threats in his home country.  *See* Exh. 2, Asylum Application  At the time of Ramon's entry to the United States he was 17 years old and properly designated as a UAC by CBP and transferred to the custody of ORR.  On January 7, 2017, ORR released Ramon  from its custody to his mother, Rosa America Lopez Lopez.  *See* Exh. 3, ORR Verification Letter.

32.     Before detention, for over ten months, he lived with his mother, her partner, and his older brother, Balmore Alexander Reyes Lopez, in Huntington Station, NY.  Upon information and belief, on October 24, 2017, Respondents   arrested and detained him at the Bergen County Jail in Hackensack, New Jersey.  Ramon is "in custody" within the meaning of the

habeas statute given Respondents' initiation and maintenance of removal proceedings against him at the Varick Street Immigration Court in New York, New York.

33.     Respondent Jefferson B. Sessions III is named in his official capacity as the Attorney General of the United States.  In this capacity, he is responsible for the administration of the immigration laws as exercised by EOIR.  Respondent Sessions routinely transacts business in the Southern District of New York, is legally responsible for administering Petitioner's removal proceedings and the standards used in those proceedings, and as such is a legal custodian of Petitioner.  Respondent Sessions' address is Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, District of Columbia 20530.

34.     Respondent Kirstjen Nielsen is named in her official capacity as Secretary of Homeland Security in the United States Department of Homeland Security.  In this capacity, she is responsible for the administration of the immigration laws. Respondent Nielsen routinely transacts business in the Southern District of New York and supervises Respondent Decker. Respondent Nielsen's address is Secretary of Homeland Security, U.S. Department of Homeland Security, Washington, D.C. 20528.

35.     Respondent Thomas Decker is named in his official capacity as the Field Office Director of the New York Field Office for ICE within the United States Department of Homeland Security.  In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations, and is a legal custodian of Petitioner. Respondent Decker's address is Office of Enforcement and Removal Operations, New York Field Office Director, 26 Federal Plaza, New York, New York 10278.

36.     Respondent James McHenry is named in his official capacity as Acting Director of the Executive Office for Immigration Review (EOIR). In this capacity, he is responsible for the administration of the immigration laws pursuant to 8 C.F.R. § 1003.0(b)(1). He is responsible for the direction and supervision of the Office of the Chief Immigration Judge, including the Immigration Courts at 26 Federal Plaza, 12th Floor, Room 1237, New York, NY 10278 and 201 Varick Street, Room 1140, New York, NY 10014. He routinely transacts business in the Southern District of New York. As such, he is legally responsible for the Petitioner's custody and removal proceedings. Respondent McHenry's office is located at the Executive Office for Immigration Review, 5107 Leesburg Pike, Falls Church, VA 22041.

37.     Respondent Department of Homeland Security ("DHS") is the federal agency responsible for enforcing Petitioner's continued detention pending his removal proceedings. DHS's address is U.S. Department of Homeland Security, Washington, DC 20528.

## JURISDICTION

38.     This Court has subject matter jurisdiction over this Petition pursuant to 28 U.S.C. § 2241; 28 U.S.C. § 1331; Article I, § 9, cl. 2 of the United States Constitution; the All Writs Act, 28 U.S.C. § 1651; the Administrative Procedure Act, 5 U.S.C § 701; and for injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.  Petitioner's current detention as enforced by Respondents constitutes a "severe restraint[]" on [Petitioner's] individual liberty," such that Petitioner is "in custody in violation of the . . . laws . . . of the United States." *Hensley v. Municipal Court*, 411 U.S. 345, 351 (1973); 28 U.S.C. § 2241.

39.     While the courts of appeals have jurisdiction to review removal orders directly through petitions for review, *see* 8 U.S.C. § 1252(a)(1), (b), the federal district courts have jurisdiction under 28 U.S.C. § 2241(d) to hear habeas claims by non-citizens challenging the

lawfulness or constitutionality of their detention by ICE.  *See, e.g.*, *Demore v. Kim*, 538 U.S. 510, 516–517 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

40.     There is no statutory requirement of exhaustion of administrative remedies where a noncitizen challenges the mandatory nature of his detention.  *See Garcia v. Shanahan*, 615 F. Supp. 2d 175, 180 (S.D.N.Y. 2009).

41.     Moreover, neither the Immigration Judge nor the Board of Immigration Appeals, as administrative agencies, can rule on the constitutional nature of Petitioner's detention claims. *See Matter of C-*, 20 I. & N. Dec. 529, 532 (BIA 1992) (noting that "it is settled" that the immigration judge and the BIA cannot decide constitutional questions).  Thus, further exhaustion is not required. *See Burns v. Cicchi*, 702 F. Supp. 2d 281, 286 (D.N.J., 2010) (excusing further exhaustion where dispositive issues had been predetermined).  In addition, it is well established that where the agency has predetermined a dispositive issue—here, the proper interpretation of the mandatory detention statute—no further action with the agency is necessary. *See, e.g., Monestime v. Reilly*, 704 F. Supp. 2d 453, 456-57 (S.D.N.Y. Apr. 9, 2010); *Garcia v. Shanahan*, 615 F. Supp. 2d 175, 180 (S.D.N.Y. 2009).

42.     To the extent that any prudential considerations lead the Court to require exhaustion as a matter of discretion, Petitioner exhausted his administrative remedies by requesting a bond hearing in Immigration Court and requesting release from Respondents, ICE.

43.     First, exhaustion should not be required where the circumstances surrounding the Respondent's arrest on or about October 24, 2017 are "circumspect."  *E.H.E. v. Lloyd,* No. 18-Civ-3089 (S.D.N.Y. 2018 ECF at 27-28) (Keenan, J.) (The Court rejected the Respondent's argument that exhaustion was required and found that "the circumstances surrounding EHE's

arrest are circumspect.  Respondents have provided the Court with a DHS warrant dated May 30, 2017, the same day EHE was arrested. The warrant does not state the grounds for EHE's arrest, and Respondents have not articulated grounds. At the time of EHE's arrest, it appears that the only evidence of his involvement with any gang is SCPD's self-serving observations that his "[c]lothing and accessories are indicative of gang membership in MS-13" and that he was "[r]egularly found associating with confirmed MS-13 gang members."  In and of themselves, EHE's choices of wardrobe and associates do not constitute criminal offenses…and EHE has not been charged with one.  The complete absence of hard evidence of EHE's affiliation with MS-13 or any other gang generates the inference that EHE's arrest was merely a pretext for placing him in detention. Moreover, EHE has never been convicted of any crime nor even before been arrested.")

44.      Second, to the extent that any prudential concerns lead the Court to require exhaustion as a matter of discretion, Ramon  has exhausted any and all effective administrative remedies available to him.  On January 25, 2018, at the first master hearing where Ramon was represented by the Legal Aid Society, Immigration Judge Lauren Farber indicated that she believed she has no jurisdiction to hold a bond hearing as Ramon was designated an arriving alien. Ramon's counsel indicated that she would brief the issue further.

45.      On February 26, 2018, Ramon, through counsel, submitted a Motion to Schedule Bond Hearing arguing that he is not properly subject to mandatory detention as a UAC, and that even if he was, UACs are afforded special protections and must be released in most circumstances. *See* Exh. 10, Motion to Schedule a Bond Hearing.

46.      Ramon also argued that he is not a flight risk nor a danger to the community, as he has no criminal history of any kind, would live with his mother, and is eligible for multiple

forms of relief, including asylum, withholding of removal under the INA and withholding

pursuant to the Convention Against Torture, as well as Special Immigrant Juvenile Status.

Alternatively, Ramon also argued that he is entitled to a hearing pursuant to *Saravia v. Sessions*,

17-cv-03615-VC, 2017 WL 5569838 (N.D. Cal, Nov. 20, 2017). Lastly, Ramon requested that if

the Judge found him subject to mandatory detention and not eligible for a *Saravia* hearing, the

Court should schedule a bond hearing pursuant to *Lora v. Shanahan*, 804 F.3d 601

(2d Cir. 2015).[2]

47.     On March 1, 2018, at a master hearing, Ramon's counsel reiterated the above

arguments. Immigration Judge Farber indicated that she believed Ramon is an arriving alien as

there is no case law or other authority to indicate that UACs cannot be designated arriving aliens

but allowed Ramon's counsel an opportunity to further brief the issue.

48.     On March 23, 2018, Ramon's counsel submitted a Supplemental Argument again

arguing that UACs are materially distinct from arriving aliens and, thus, a UACs cannot be

designated an arriving alien.   *See* Exh. 11, Supplemental Briefing to Immigration Judge.

49.     On April 5, 2018, at a master hearing, Judge Farber again indicated that she has

no jurisdiction to hold a bond hearing.

50.     He requested parole from ICE and was denied on March 15, 2018.  *See* Exh. 7,

Denial of Ramon's Parole Request dated March 15, 2018.

51.     Finally,  the Supreme Court has recognized that courts should not require

exhaustion where there is an unreasonable or indefinite time-frame for administrative action.

Exhaustion is thus not appropriate where plaintiff "may suffer irreparable harm if unable to secure

---

[2] In *Jennings v. Rodriguez*, 138 S. Ct. 830  (2018)  the Supreme Court reversed and remanded the Ninth Circuit
judgment in *Jennings* and shortly thereafter, vacated and rmanded the Second Circuit's analogous decision in *Lora
v. Shanahan*, 804 F.3d 601 (2d Cir. 2015). *Shanahan v. Lora*, No. 15-1205, 2018 WL 1143819 (U.S. Mar. 5, 2018).

immediate judicial consideration of his claim." *Id.* at 147. Petitioner has a constitutionally

protected liberty interest in his freedom from government custody. *Zadvydas*, 533 U.S. at 690.

Petitioner's unlawful indefinite detention constitutes irreparable harm. *See Seretse-Khama v.*

*Ashcroft*, 215 F. Supp.2d 37, 53 (D.D.C. 2002); *Hardy v. Fischer*, 701 F.Supp. 2d 614, 619

(S.D.N.Y. 2010) (threat of unlawful detention and reimprisonment would constitute quintessential

irreparable harm).  Moreover, each day that Ramon is detained he is being deprived an education

and this will result in a lasting impact on his life.  *See,   Plyler v. Doe*, 457 U.S. 202, 221  (1982)

(The Supreme Court noted "the importance of education in maintaining our basic institutions, and

*the lasting impact of its deprivation on the life of the child*[.]"). (emphasis added).

## VENUE

52.      Pursuant to 28 U.S.C. § 2241(d), venue properly lies in the Southern District of

New York because Petitioner is physically present and in the custody of Respondents within the

district. In addition, Petitioner's pending removal proceedings are taking place within the district

at the Immigration Court located at 201 Varick Street, New York, New York 10014, and the place

of employment of Respondent Decker is located within the district, at 26 Federal Plaza, New

York, New York 10278.  No binding precedent applicable to immigration detainees, nor the

habeas statute, indicate that venue is not proper in the Southern District of New York. *See* 28

U.S.C. § 2241.

## STATEMENT OF FACTS

53.      Ramon  is a 19-year-old national and citizen of El Salvador. After fleeing gang

threats in his home country, he entered the United States on December 8, 2016. *See* Exh. 2,

Asylum Application. At the time of entry he was 17 years old and properly designated as a UAC

by U.S. Customs & Border Protection and transferred to the custody of the ORR pursuant to the

applicable law, as laid out in the *Flores* Settlement, 8 U.S.C. 1232(b)(3) of the Trafficking and

Victims Protection Reauthorization Act ("TVPRA"), and 6 U.S.C. 279.

54.     On January 7, 2017, ORR released Ramon from its custody to his mother, Rosa

America Lopez Lopez, pursuant to the applicable law. *See* Exh. 3,  ORR Verification of Release.

For over ten months without incident, he lived with his mother, her partner, and his older brother,

Balmore Alexander Reyes Lopez, in  Huntington Station, NY.  He also attended the 9th grade at

the Huntington Station High School.  *See* Exh. 1,  School Verification Letter.

55.     Ramon was placed in immigration removal proceedings and was attending all of

his Court dates at 26 Federal Plaza, New York, NY prior to his detention by Respondents, ICE, on

or about October 24, 2017.  He attended his first master hearing at 26 Federal Plaza on August 10,

2017, where pleadings were conducted and Ramon's previous counsel indicated that she would be

filing a guardianship petition in the Family Court to begin the process for Special Immigrant

Juvenile Status and was considering applying for asylum.  His next appearance before the

Immigration Court at 26 Federal Plaza, New York, NY was scheduled to take place in January

2018.  *See* Exh. 12, Notice to Appear ("NTA").

56.     Prior to his detention on or about October 24, 2017, Ramon's biological mother

had filed a guardianship petition on Mr. Arevalo's behalf in the Suffolk Family Court, which was

granted on March 26, 2018.

57.     After Ramon was detained on or about October 24, 2017, the Respondents, EOIR,

did not schedule a hearing date before the Immigration Judge at 201 Varick Street, New York,

NY until January 2018, approximately three months later.

58.     On January 25, 2018, Ramon met with The Legal Aid Society through the New

York Immigration Family Unit Project ("NYIFUP") and appeared with his attorney on the same

day.   Judge Farber indicated that she believed she has no jurisdiction to hold a bond hearing as Ramon was designated an arriving alien. Ramon's counsel indicated that she would brief the issue further.

59.      On January 30, 2018, Ramon's counsel reached out to the DHS attorney on the case, Mr. Michael McFarland, requesting information regarding the reason for Ramon's re-detention and whether ICE had considered least restrictive setting prior to placing Ramon in Bergen County Jail. Counsel never received a response to that request. *See* Exh.  4, January 30, 2018 Email to ERO/OCC.

60.      On February 26, 2018, Ramon, through counsel, filed a Motion to Schedule Bond Hearing with the Immigration Court. *See* Exh.  10, Motion to Schedule a Bond Hearing.

61.      On February 27, 2018, Ramon sought release from the Respondents through a parole request.  *See* Exh. 4,  Ramon's Parole Request.  On March 15, 2018, the Respondents denied Ramon's parole request without any explanation other than to state in a generalized conclusion that "there is no compelling reason to warrant a favorable exercise of discretion in this case." *See* Exh. 5,  Denial of Ramon's Parole Request dated March 15, 2018.

62.      At the time of the Denial of Ramon's Parole Request and as of the date of this Petition, the Respondents have failed to provide any evidence or information to support Ramon's arrested and detention on or about October 24, 2017.

63.      On March 26, 2018, Ramon's mother's Guardianship Petition was granted by Judge Spinner at the Suffolk County Family Court. *See* Exh. 14,  Order of Judge Spinner.

64.      On or about March 31, 2018,  the undersigned submitted a request for reconsideration of the Denial of Parole Request to ICE's OCC.  *See* Exh. 8,  March 31, 2018 Email to ERO/OCC.

65.     The request for reconsideration detailed the fact that Ramon's detention by ICE resulted in separation from his family and a disruption of his education.  The undersigned also set forth that Ramon was released to his mother from ORR custody pursuant to the TVPRA and that he is seeking multiple forms of relief due to his fear of returning to El Salvador.  The undersigned did not receive a response from OCC and therefore sent another request on April 24, 2018.  *See* Exh. 13,   April 24, 2018 Email to ERO/OCC").

66.     The only response received by the undersigned to date was one in which the OCC inquired as to whether a habeas petition was pending for Ramon.  The undersigned responded that a habeas petition was not pending as of that date and has not received any further response from the OCC.  *See id.*

67.     On April 5, 2018, at a master hearing, Judge Farber again indicated that she has no jurisdiction to hold a bond hearing. Ramon, through counsel, indicated that his mother's guardianship petition was recently granted and he will be filing an I-360 Petition for Amerasian, Widow, or Special Immigrant shortly. Moreover, counsel indicated that she would be submitting an Asylum Application to USCIS, as he is a UAC and USCIS—not the Immigration Court—has initial jurisdiction to adjudicate the application. The next hearing was scheduled for May 10, 2018 for an update on the I-589 Application and the I-360 Petition.

68.     On May 7, 2018, Ramon filed an application for asylum, withholding of removal and withholding under the Convention Against Torture with the U.S. Citizenship and Immigration Services.  *See* Exh. 3, Asylum Application.

69.     Due to his age and vulnerability, Ramon  is terrified of being in the detention center and has been unable to sleep. He is even scared to use the phone to call his mother on a

regular basis. *See* Exh. 9,  Letter from Patricia Telfort, Social Worker with The Legal Aid Society.

70.     His mother, in turn, does not have the ability to visit Ramon because the detention center is far away from her home and she has no means of getting to Bergen County Jail.  Ramon has missed over six months of school.   *See Plyler v. Doe*, 457 U.S. 202 (1982)  457 U.S. 202 (1982).

71.     The Bergen County Jail does not have any facilities for continued education or tutoring.  As such, Ramon cannot continue his education if he remains in custody

72.     Ramon has been now detained for more than *180 days* without the Respondents providing any reasons for his re-detention. In the meantime, he has been unable to see or speak with his family, has missed over six months of school and has been unable to sleep.

## LEGAL BACKGROUND

### *Ramon is Not Properly Subject to Mandatory Detention Under 8 U.S.C. § 1225(b)*

73.     Ramon is not properly subject to mandatory detention because he is neither an arriving asylum seeker nor an arriving LPR (or any other alien seeking admission after previously being admitted).  Rather, at the time of his entry Ramon was a UAC who was placed in ORR custody and referred for full removal proceedings. Nothing in the text of § 1225(b) states that aliens in this position must be mandatorily detained. An interpretation to the contrary would be unreasonable, unconstitutional, and ultra vires because it is unsupported by the text of § 1225(b), inconsistent with Congressional intent, and would result in prolonged mandatory detention in violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

74.     UACs must be released from custody in the least restrictive environment. Specifically, the TVPRA provides that UACs in custody of the Health and Human Services "shall

be promptly placed in the least restrictive setting that is in the best interest of the child." 8 U.S.C.
§1232(c)(2)(A). Under the TVPRA, "[a] child shall not be placed in a secure facility absent a
determination that the child poses a danger to self or others or had been charged with committing
a criminal offense." 8 U.S.C. § 1232(c)(2)(A).[3]

75.     In conjuncture, the *Flores* Settlement provides that "[w]here the INS determines
that the detention of the minor is not required either to secure his or her timely appearance before
the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall
release a minor from its custody without unnecessary delay" to a sponsor.  *See, Flores* Settlement
at ¶18 ("Upon taking a minor into custody, the INS, or the licensed program in which the minor is
placed, shall make and record the prompt and continuous efforts on its part toward family
reunification…)

76.     As Ramon was released from ORR custody to the custody of his mother pursuant
to the *Flores* Settlement and the TVPRA, ORR must have found that his release was the least
restrictive setting and in his best interest, and that Ramon did not present a danger to himself or
others and was not a flight risk.[4]

77.     Even though Ramon has since then turned 19, he still benefits from the TVPRA's
mandate to release him to the "least restrictive setting." *See* 8 U.S.C. §1232(c)(2)(A).  The 2013
amendment to the TVPRA requiring the release of UACs who reach the age of 18 after entry into
the U.S. clearly indicates the congressional intent to repeal 8 C.F.R. §1003.19 (mandatory
detention of arriving aliens) as applied to UACs designated as arriving aliens.[5]

---

[3] A "secure care facility" is a security prison for children with "a secure perimeter, major restraining construction inside the facility, and procedures typically associated with correctional facilities." ORR Rules, §1.2.4.
[4] This finding is further supported by the Suffolk County Family Court which has also found that it is in the best interest of Ramon to have his mother be his legal guardian.
[5] The amendment in question indicates:

78.     The language of the amendment does not have an exception for any sub-category of UACs, including those designated arriving aliens because the core purpose is to deal with individuals such as Ramon who arrived in the United States seeking safety. Therefore, congressional intent is clearly to protect all UACs in this category, irrespective of where they entered, from being put into harsh prison conditions simply because they were no longer under 18.

79.     Moreover, as the TVPRA and the 2013 amendment were enacted after 8 C.F.R. § 1003.19 (enacted on May 19, 1998), and Congress was fully aware of the mandatory detention requirements for most arriving aliens, the TVPRA language must be read as repealing the bond restrictions of 8 C.F.R. § 1003.19 as they apply to UACs who reach the age of 18 and are designated as arriving aliens.[6]

80.     Therefore, Congress could not have intended for 8 C.F.R. § 1003.19 to continue to preclude Immigration Judges from exercising jurisdiction over the bond of UACs who turn 18 during the pendency of their immigration proceedings.

81.     Moreover, the amendment cannot be read to only apply to UACs who are directly

---

SEC. 1261. APPROPRIATE CUSTODIAL SETTINGS FOR UNACCOMPANIED MINORS WHO REACH THE AGE OF MAJORITY WHILE IN FEDERAL CUSTODY. Section 235(c)(2) of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (8 U.S.C. 1232(c)(2)) is amended-
(1) by striking " Subject to" and inserting the following:
"(A) MINORS IN DEPARTMENT OF HEALTH AND HUMAN SERVICES CUSTODY.-Subject to" ; and
(2) by adding at the end the following :
"(B) ALIENS TRANSFERRED FROM DEPARTMENT OF HEALTH AND HUMAN SERVICES TO DEPARTMENT OF HOMELAND SECURITY CUSTODY.- If a minor described in subparagraph (A) reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary *shall* consider placement in the least restrictive setting available after taking into account the alien 's danger to self, danger to the community, and risk of flight. Such aliens *shall* be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives based on the alien's need for supervision, which may include placement of the alien with an individual or an organizational sponsor, or in a supervised group home."

*See* Senate Bill 47, passed into law on Mar. 7, 2013 (emphasis added).

[6] While Courts generally avoid finding implied revocation, where two federal statues are "irreconcilably conflicting," the courts apply the rule that the later of the two prevails. *Watt v. Alaska*, 451 U.S. 259, 266 (1981).

20

taken from ORR custody and placed into ICE custody on their 18th birthday.  It must extend to those who are released to sponsors and then re-detained after the age of 18.  An alternative construction would render meaningless the procedural obligations designed to protect this vulnerable population, and ensure release into the least restrictive setting.

82.     The amendment states that when the minor "reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary shall consider placement in the least restrictive setting available." *See id*. While there are two factors that must be satisfied, specifically 1) reaching 18 years of age and 2) being transferred into DHS custody, nothing in this language dictates that both must have been satisfied at the same time. Therefore, even in cases where the UAC was released to a sponsor, turned 18 and, thereafter, was detained by ICE, the Respondents must consider placement in the least restrictive setting available.

83.     Allowing the Respondents to detain indefinitely any UAC who reached the age of 18, without any review of dangerousness or flight risk, solely by designating them an arriving alien would be in direct violation of 8 U.S.C. § 1232(2)(B).  Its mandate is to release UACs from detention, as long as they do not pose a flight risk or danger to the community. Considering Congress' intent in enacting the TVPRA and further expanding its protections for UACs in 2013, the Respondents, ICE, do not have sole discretion to determine or re-determine the custody status of Ramon and the Immigration Judge must be able to exercise discretion over his custody to comply with the TVPRA. *See, Saravia v. Sessions,* 17-cv-03615-VC, 2017 WL 5569838 (N.D. Cal, Nov. 20, 2017), Order Granting the Motion for Preliminary Injunction; Granting the Motion for Provisional Class Certification; Granting in Part and Denying in Part the Federal Defendants Motion to Dismiss; Granting in Full the Non-Federal Defendants' Motion to Dismiss, at 1 ("Once a noncitizen has been released, the law prohibits federal agents from rearresting him merely

because he is subject to removal proceedings. Rather, the federal agents must be able to present evidence of materially changed circumstances—namely, evidence that the noncitizen is in fact dangerous or has become a flight risk, or is now subject to a final order of removal. And if the noncitizen disputes the notion that changed circumstances justify his rearrest, he is entitled to a prompt hearing before an immigration judge.")[7]  There is no justification for the spirit of the *Savaria* decision to apply in this case.

### *Even if Ramon is Properly Classified as an Arriving Alien His Detention is Unconstitutional.*

84.       ""It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.'" *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" that the Due Process Clause protects. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *see also id*. at 718 (Kennedy, J., dissenting) ("Liberty under the Due Process Clause includes protection against unlawful or arbitrary personal restraint or detention.").

85.       Due process therefore requires "adequate procedural protections" to ensure that the government's asserted justification for physical confinement "outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Id*. at 690 (internal quotation marks omitted). In the immigration context, the Supreme Court has recognized only two valid

---

[7] ICE's ability to place UACs into custody is further restricted in a number of ways. First, UACs are protected by the *Flores* Decree, which gives the immigration judge the jurisdiction to review their custody determinations. *See Flores v. Sessions*, 862 F.3d 863 (9th Cir 2017)(reaffirming the validity of the *Flores* Decree). The Flores Settlement sets specific policies and requirements applicable to "any person under the age of eighteen (18) years who is detained in the legal custody of the INS" or successor organizations. *Flores* Settlement at ¶ 4 (*available at* https://www.aclu.org/sites/default/files/assets/flores_settlement_final_plus_extension_of_settlement011797.pdf). Among other things, the Settlement sets forth a "general policy favoring release," *id.* § VI; limits the use of secure detention, *id.* ¶ 21; sets monitoring and reporting requirements, *id.*, ¶¶ 28-31; and provides for attorney visitation, *id.* ¶¶ 32-33. In addition, an Exhibit to the Settlement sets detailed standards for educational services, medical services, counseling, religious accommodations, acculturation services, privacy, family reunification, and legal services. *Id.*

purposes for civil detention—to mitigate the risks of danger to the community and to prevent flight. *Id.*; *Demore*, 538 U.S. at 528.

86.     The Due Process Clause protects the substantive due process right to be free from unjustified deprivations of liberty as well as the procedural due process right to a neutral forum in which to contest prolonged detention. *Zadvydas*, 533 U.S. at 690.  These rights extend to both "removable and inadmissible" non-citizens. *Zadvydas,* 533 U.S. at 721 (Kennedy, J. dissenting) (holding that both "removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious"); *Rosales-Garcia* v. *Holland*, 322 F.3d 386, 409 (6th Cir. 2003) ("[E]xcludable aliens—like all aliens—are clearly protected by the Due Process Clauses of the Fifth and Fourteenth Amendments.") (citing *Yick Wo* v. *Hopkins*, 118 U.S. 356 (1886)).

87.     Petitioner's prolonged detention in this case violates his substantive due process rights, including the right to be free from "inhumane treatment," such as "indefinite, hearingless detention." *Castro* v. *U.S. Dep't Homeland Sec.*, 835 F.3d 422, 449 n.32 (3d Cir. 2016); *see also Zadvydas*, 533 U.S. at 693−94; *Lynch* v. *Cannatella*, 810 F.2d 1363, 1374 (5th Cir. 1987).

88.     In *Mathews v. Eldridge*, the Supreme Court laid out the familiar three factors that must be weighed in order to determine if government procedures that accompany a liberty deprivation comport with due process:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335.

89.     Addressing these factors in order, the liberty interest at stake in this case is of the highest order. *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982)\("[L]iberty from bodily restraint

always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action.") (quoting *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 18 (1979 (Powell, J., concurring)).

90.     The discretionary parole process provided for in 8 U.S.C. § 1225(d)(5)(A) is insufficient to safeguard Ramon's constitutional rights.  Courts have consistently found this statutory provision to be an inadequate substitute for an individualized hearing complying with Due Process. *See Zadvydas*, 533 U.S. at 692 (post-order release procedures insufficient to satisfy due process).   Indeed, Due Process requires that Ramon receive an independent process before an impartial adjudicator where the government bears the burden of proof.

91.     First, only employees and officers of DHS are authorized to make parole determinations; there is no independent entity authorized to grant parole. *See* 8 C.F.R. § 212.5 (listing individuals with authority to grant parole under 8 U.S.C. § 1182(d)(5)(A)). Thus, the only individuals authorized to grant parole under § 1182(d)(5)(A) belong to the same agency tasked with effectuating the parole applicant's detention and deportation.

92.     Second, the denial of a parole request made under 8 U.S.C. § 1182(d)(5)(A) is not subject to judicial review by an Immigration Judge or, to the extent the denial is discretionary, by federal judicial review. *See* 8 U.S.C. § 1252(a)(2)(B)(ii). Thus, the existence of this parole process does not satisfy Petitioner's right to due process. *See Diop*, 656 F.3d at 231 (requiring "an individualized inquiry into whether detention is still necessary to fulfill the statute's purposes of ensuring that an alien attends removal proceedings and that his release will not pose a danger to the community"); *Leslie v. Attorney General of the US*, 678 F.3d 265, 267 at n.2 (3d Cir. 2017) (rejecting as procedurally inadequate a "post order custody review" conducted by DHS, at which neither the respondent nor counsel was present and no hearing was held); *Singh v. Holder*, 638

24

F.3d 1196, at 1200, 1203 (9th Cir. 2016) (holding that the government "must prove by clear and convincing evidence that an alien is a flight risk or a danger to the community to justify denial of bond" given "the substantial liberty interest at stake") and *Alaka v. Elwood*, 225 F. Supp. 2d 547 at 559 (E.D. Penn. 2002) (rejecting the government's claim that the possibility of parole under § 1182(d)(5)(A) provided adequate due process and holding that "[d]ue process is not satisfied . . . by rubberstamp denials of release based on a cursory review of an alien's file").

### The Fourth Amendment of the U.S. Constitution Requires Government Agents to Have Probable Cause to Arrest an Individual

93.     It has long been established that the Fourth Amendment requires government agents to have probable cause to arrest an individual whom they believe has committed a crime to justify an arrest. *Gerstein*, 420 U.S. at 111; *Johnson v. United States*, 333 U.S. 10, 13–14 (1948). It is equally well established that an immigration agent must have probable cause to arrest a person for a suspected immigration violation. *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82 (1975) (holding that, in the immigration context, after a *Terry* stop "any further detention or search must be based on consent or probable cause"); *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) (holding that a warrantless search of a car by immigration agents also requires probable cause). The INA purports to authorize the arrest of a person on immigration charges where the arresting agent has "reason to believe that the alien so arrested is in the United States in violation of any such law or regulation[.]" 8 U.S.C. § 1357(a)(2)

94.     However, "reason to believe" in this context must be equivalent to probable cause. *See, e.g.,* Def.'s-Resp. Mem. Of P. & A. in Supp. of Their Mot. To Dismiss Compl. 4, (Brief for Defendant at 4, *Cancino v. Kelly*, No. 3:17-cv-00491-BAS-BGS (S.D. Cal. May 22, 2017)); Def. Not. of Mot. to Dismiss and Mem. Of P. & A. in Supp. of Def.'s Mot. to Dismiss Footnote 5, (Brief for Defendant at Footnote 5, *Roy v. Los Angeles*, No. 2:13-cv-04416-BRO-

FFM, 2014 WL 5149503 (C.D. Cal. Sept. 15, 2014)).

95.     In order to avoid conflicting with the dictates of the Fourth Amendment, courts, including the Court of Appeals for the Second Circuit, have universally interpreted the "reason to believe" language as equivalent to probable cause.  *See, e.g.*, *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010); *Babula v. INS*, 665 F.2d 293, 298 (3d Cir. 1981); *Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980); *Ojeda-Vinales v. Immigration & Naturalization Serv.*, 523 F.2d 286, 288 (2d Cir. 1975); *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975) *cert. denied*, 423 U.S. 1035 (1975); *Au Yi Lau v. INS*, 445 F.2d 217, 222 (D.C. Cir. 1971), *cert. denied*, 404 U.S. 864 (1971); *see also Cotzojay v. Holder*, 725 F.3d 172, 181 (2d Cir. 2013) ("[I]t is uncontroversial that the Fourth Amendment applies to aliens and citizens alike[.]").

96.     In *Gerstein v. Pugh*, the Supreme Court established that the Fourth Amendment requires that the arresting officer's assessment of probable cause must be confirmed by a "neutral and detached magistrate."  420 U.S. at 112.   The Court expressed a "preference" for "magistrate's review of the factual justification prior to any arrest," but understood that rigidly imposing a pre-arrest requirement could "constitute an intolerable handicap for legitimate law enforcement."  *Id.* at 113.  Accordingly, the Court held that pre-arrest magistrate review was not required, but that where an arrest was made without such review, "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Id.* at 114.

97.     If the neutral and detached magistrate determines that probable cause is lacking, the individual must be released; though, notably the prosecution may continue.  *Id.* at 119; *see also United States v. Chavez*, 705 F.3d 381, 386 (8th Cir. 2013) ("Dismissal is also not the appropriate remedy for a *Gerstein* violation.").

98.     While *Gerstein* established that a "fair and reliable determination of probable cause [is] a condition for any significant pretrial restraint of liberty, and [that] this determination must be made by a judicial officer either before or promptly after arrest," *id*. at 125, sixteen years later the Supreme Court clarified what it meant by "prompt" in *County of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991).  In *County of Riverside*, the Court established 48 hours as the default standard for the requirement of a "prompt" probable cause determination.  *Id*. at 56.  In so holding, the Court noted however, that any "unreasonable delay," even of less than 48 hours, was prohibited.  *Id*.  It explained that unreasonable delays would include, for example "delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake."  *Id*.  Whenever delay of more than 48 hours occurs before presentation of evidence of probable cause to an impartial magistrate, "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance."  *Id*. at 57.

99.     While *Gerstein* and *County of Riverside* arose in the criminal context, the core Fourth Amendment interests which they animate apply with equal force to immigration and other civil arrest and detention contexts.  *See generally Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) (acknowledging that while deportation is "not, in a strict sense, a criminal sanction," it is "a particularly severe 'penalty'" that is "intimately related to the criminal process").  In both the criminal and immigration context, the role of law enforcement officers involved in investigating and prosecuting violations of the law "is inconsistent with the constitutional role of a neutral and detached magistrate" and, as a result, a probable cause determination from such officers simply cannot provide sufficiently "meaningful protection from unfounded interference with liberty." *Gerstein*, 420 U.S. at 114, 117.

100.    The liberty interest in being free from incarceration is precisely the same for immigration detainees as it is for pre-trial detainees housed in Bergen County Jail, which houses immigration detainees alongside, and under the same conditions as, criminal detainees.  Likewise, the danger that "zealous officers" may not apply exacting scrutiny to the required probable cause inquiry in the criminal context, *id.* at 112, is animated by the same dynamics and pressures on immigration agents. *See St. John v. McElroy*, 917 F. Supp. 243, 251 (S.D.N.Y. 1996) (holding that former INS had "every incentive to continue to detain aliens" and "little incentive" to release them, a structural scheme that "creates a powerful potential for bias against aliens," whereas "an impartial decision maker would greatly lessen the likelihood of bias, and the possibility of an erroneous deprivation of the alien's constitutionally protected liberty interest"); *cf.* Amy B. Wang, *Donald Trump Plans to Immediately Deport 2 Million to 3 Million Undocumented Immigrants*, WASH. POST (Nov. 14, 2016), https://www.washingtonpost.com/news/the-fix/wp/2016/11/13/donald-trump-plans-to-immediately-deport-2-to-3-million-undocumented-immigrants/?utm_term=.f905896d709e (explaining the Presidential directive to ICE agents to drive up arrest numbers); John Bowden, *ICE Arrests Climb Nearly 40 Percent Under Trump*, THE HILL (May 17, 2017, 12:35 PM), http://thehill.com/latino/333839-ice-immigration-arrests-climb-nearly-40-percent-under-trump (describing how Trump's directive to ICE agents to drive up arrests numbers is impacting arrest behavior).

101.    Indeed, virtually every civil arrest scheme in American law provides for some type of prompt post-arrest judicial oversight of detention to ensure that the significant restraint on liberty is justified.  *See, e.g., Schall v. Martin,* 467 U.S. 253, 274 (1984) (referencing *Gerstein* and holding that probable cause hearing held six days after arrest for individual detained on a civil juvenile delinquent charge was an adequate protection against unlawful detention in that context);

28

*Schneyder v. Smith*, 653 F.3d 313, 326 (3d Cir. 2011) (holding that prolonged detention under a material witness statute was a violation of the Fourth Amendment because "[w]hile the potential harm to the prosecution's case remained the same, the weight of Schneyder's liberty interest grew considerably . . . [considering the] 131 days in jail before the trial would even start."); *Project Release v. Prevost*, 722 F.2d 960, 975 (2d Cir. 1983) (holding that a civil mental health commitment scheme provided adequate judicial oversight because of "'the layers of professional [and judicial] review'" contained in the statutory scheme together with "the availability of a judicial hearing within five days of demand by the patient, relative or friend"); *cf. Krimstock v. Kelly*, 305 F.3d 40 (2d Cir. 2002) (requiring "prompt review by a neutral fact-finder" following seizure of vehicles of people arrested for driving under the influence). Thus, while the strict 48-hour rule of *County of Riverside* has not been universally imported into all civil contexts, the principle of prompt impartial magistrate review is well recognized in the context of civil as well as criminal arrests.

102.    In this case, there is no evidence of probable cause to justify the detention of Ramon on or about October 24, 2017. Ramon has not been provided with any due process to challenge his detention that resulted in him being torn from his mother and education and placed in a correctional setting.

### *Ramon's Continued Detention Denies His Right to a Free Appropriate Public Education Despite his Immigration Status*

103.    Almost 65 years ago, the Supreme Court noted that "it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Brown v. Board of Education of Topeka*, 347 U.S. 483, 493 (1954).

104.     In 1982, in *Plyler v. Doe*, the Supreme Court held that students cannot be denied a free public education on account of their immigration status.  457 U.S. 202 (1982)  The court also noted "the importance of education in maintaining our basic institutions, and *the lasting impact of its deprivation on the life of the child*[.]" *Id.* at 221 (emphasis added).

105.     Ramon was detained by the Respondents on or about October 24, 2017 at the home of his mother, Rosa America Lopez Lopez in Long Island, New York.  At the time of his detention by the Respondents he was attending the 9th grade at the Huntington Station High *See* Exh. 1,  School Verification Letter for Petitioner.

106.     Ramon has missed over six months of school.   The Bergen County Jail does not have any facilities for continued education or tutoring.  As such, Ramon cannot continue his education if he remains in custody.

### Ramon  Should be Immediately Released

107.     During the pendency of this Petition, the Court should order the Respondents to immediately release Ramon.  Ramon's detention is not justified because the government has not established by clear and convincing evidence that he presents a risk of flight or danger.  In fact, the government already made the determination that Ramon did *not* present a flight risk or danger when they released him to the care of his mother.

108.     The Court's authority to release habeas corpus petitioners during the pendency of their petitions is governed by *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001); *see also Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 153 (2d Cir. 2007) (explaining the REAL ID Act of 2005 "did not qualify our inherent authority to admit to bail petitioners in immigrations cases").

109.     Where a petitioner seeks injunctive relief, he must demonstrate 1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of

preliminary relief; 3) that the balance of equities tip in his favor; and 4) that an injunction is in the public interest. *See Winter v. National Resources Defense Council*, 555 U.S. 7 (2008). Ramon meets that burden.

110.    Each day that Ramon remains in detention, he suffers irreparable harm. "[I]rreparable harm is presumed where there is an alleged deprivation of constitutional rights." *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) (citing *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary"). Even absent that presumption, Ramon's continued detention will cause irreparable harm to his physical and mental health. *See,  Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 511 (2d Cir. 2005) ("claims of emotional and physical harm may in some circumstances justify preliminary injunctive relief") and *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332-33 (2d Cir. 1995) (upholding finding of irreparable harm based on "physical and emotional harm" that included the "risk of injury, infection, and humiliation").

111.    Ramon's release is both in the public interest, and supported on consideration of the balance of equities.  The "status quo" in preliminary-injunction parlance is really a "status quo ante." *See Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 90 (2d Cir. 1983) (referring to reinstatement of benefits as "restoration of the status quo ante"); accord *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (en banc) (per curiam) ("requir[ing] a party who has disturbed the status quo to reverse its actions ... restores, rather than disturbs, the status quo ante, and is thus not an exception" to the ordinary standard for preliminary injunctions).  This "ante" formulation of the status quo in the realm of equities is required to prevent Respondents seeking shelter under a current "status quo" precipitated by its wrongdoing.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION:

### VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT-5 U.S.C. §706(2) RESPONDENTS ARE VIOLATING 8 U.S.C. §1232(c)(2)(B) BY FAILING TO CONSIDER THE LEAST RESTRICTIVE SETTING FOR RAMON AND FAILING TO MAKE ALTERNATIVES TO DETENTION AVAILABLE.

112.    Petitioner repeats and re-alleges the allegations of all proceeding paragraphs of this Petition.

113.    Under the Administrative Procedures Act, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. The reviewing court "shall…hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E).

114.    Upon information and belief, on October 24, 2017, the Respondents, ICE, came to Petitioner's home and asked him to come to 26 Federal Plaza for questioning There, ICE agents asked Ramon questions about gang membership and affiliations. Ramon denied all gang allegations.   Despite the fact that he has neither been arrested in the United States nor has any affiliation with gangs, the ICE agents arrested Ramon, processed him for detention and brought him to the Bergen County Jail in Hackensack, New Jersey.   Ramon has *no criminal history and has never been arrested in the United States or anywhere else in the world.*

115.    Ramon entered the United States at the age of 17, was properly designated a UAC, placed into ORR custody and thereafter released to the care of his mother.  *See* Exh. 3,  ORR Verification of Release

116.    8 U.S.C. §1232(2)(B) requires that the Respondents, ICE, "shall consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight." 8 U.S.C. §1232(2)(B).

117.    The Respondent's unilateral decision to detain Ramon on or about October 24, 2017 and place him in the Bergen County Jail where he is detained in conditions identical to those of county jail inmates serving criminal sentences disregards the requirements of 8 U.S.C. §1232(2)(B) and violates the APA.

118.    The Respondents' actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" 5 U.S.C. §706(2)(C) and "in excess of statutory jurisdiction, authority or limitations, or short of statutory right," 5 U.S.C. §706(2)(C).

119.    Therefore, the Respondents should be compelled under 5 U.S.C. §706(1) to take the actions it is required to take pursuant to 8 U.S.C. §1232(2)(B).

## SECOND CAUSE OF ACTION:

### VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT—RESPONDENTS FAILED TO PROVIDE CONSTITUTIONALLY ADEQUATE PRE-DEPRIVATION OR POST-DEPRIVATION PROCEDURAL PROTECTIONS.

120.    Petitioner repeats and re-alleges the allegations of all proceeding paragraphs of this Petition.

121.    Respondents violated Ramon's due process rights under the Fifth Amendment to the United States Constitution by detaining him after he was released by ORR without providing adequate procedural protections before or after the resultant deprivation of his liberty.

122.    The detention of Ramon by the Respondents on or about October 24, 2017, caused him to be arrested, separated from mother, deprived of his education, and confined in a county jail. "The Due Process Clause 'imposes constraints on governmental decisions which

33

deprive individuals of "liberty" or "property" interests within the meaning' of the Fifth

Amendment." *Barrows v. Burwell*, 777 F.3d 106, 113 (2d Cir. 2015) (quoting *Mathews v.

Eldridge*, 424 U.S. 319, 332 (1976)). The Due Process Clause "applies to all 'persons' within the

United States, including aliens, whether their presence here is lawful, unlawful, temporary, or

permanent." *Zavydas v. Davis*,  533 U.S. 678, 693 (2001). A liberty interest that cannot be

revoked without adequate due process under the Fifth Amendment to the U.S. Constitution,

regardless of immigration status.

123.    Respondents detained Ramon without obtaining an order from the immigration

judge or any other neutral arbitrator, and without providing him with any procedural protections

sufficient to justify the enormous intrusions into Ramon's protected rights. At a minimum, the

protections should have included notice of the intention to detain and the justification for

detention, service of the evidence proving the justification for detention, a hearing before a neutral

arbitrator at which the government carried the burden of proof to establish by clear and

convincing evidence material to whether Ramon  poses a flight risk or a danger to the public, the

right to contest the allegations and be represented by counsel, and an opportunity to appeal the

revocation determination. *See, e.g.*, *Morrissey*, 408 U.S. 471 (holding that parole may not be

revoked without the minimum due process protections of written notice of the alleged violations,

disclosure of adverse evidence, opportunity to present defense evidence and confront witnesses,

hearing before a neutral adjudicator, and written statement of fact findings); *U.S. v. Sanchez*, 225

F.3d 172, 175 (2d Cir. 2000) ("as a matter of due process, a probationer is entitled to: written

notice of the claimed violations of his probation; disclosure of the evidence against him; an

opportunity to be heard in person and to present witnesses and documentary evidence; the right to

confront and cross-examine adverse witnesses…; a neutral hearing body; and a written statement

by the factfinder as to the evidence relied on and the reasons for revoking probation."). Ramon's detention by the Respondents, ICE, therefore violated his right to due process under the Fifth Amendment.

124.    The Respondents have failed to provide Ramon with constitutionally adequate procedural protections both before and after the deprivation of liberty caused by his detention on or about October 24, 2017 in violation of the Due Process Clause.

### THIRD CAUSE OF ACTION:

### VIOLATION OF THE FOURTH AMENDMENT—RESPONDENTS' RE-ARREST AND CONTINUING DETENTION OF PETITIONER CONSTITUTES AN UNREASONABLE SEIZURE

125.    Petitioner re-allege and incorporate by reference each and every allegation contained in the proceeding paragraphs as set forth fully herein.

126.    The Fourth Amendment to the United States Constitution protects all persons against unreasonable searches and seizures. U.S. Const. Amend. IV. To comply with the Fourth Amendment's prohibition against unreasonable seizures, an arresting officer must have their probable cause determination reviewed and confirmed by a "neutral magistrate" either before arrest or promptly thereafter. *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975); *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) (establishing 48 hours as the default standard for the requirement of a "prompt" probable cause determination).

127.    At no time prior to Ramon's arrest did any neutral or detached judicial officer exercise independent judgment to confirm Respondents' assessment that it possessed probable cause to arrest and detain the Petitioner.   Moreover, even now, more than more than 180 days after the date of his arrest,  there is no evidence of probable cause to justify the detention of Ramon on or about October 24, 2017.

128.     Ramon has not been provided with any process to challenge his detention that resulted in him being torn from his mother and education and placed in a prison setting.

129.     Re-detention of an individual previously adjudicated not a flight risk or a danger to the public, without a prior or prompt probable cause determination, allows the government to arbitrarily undermine the adjudicator's authority and constitutes an unreasonable seizure under the Fourth Amendment to the U.S. Constitution.

## FOURTH CAUSE OF ACTION:

### VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT: PETITIONER'S PROLONGED DETENTION WITHOUT A MEANINGFUL INDIVIDUALIZED REVIEW VIOLATES HIS DUE PROCESS RIGHTS.

130.     Petitioner re-allege and incorporate by reference each and every allegation contained in the proceeding paragraphs as set forth fully herein.

131.     The Due Process Clause protects the substantive due process right to be free from unjustified deprivations of liberty as well as the procedural due process right to a neutral forum in which to contest prolonged detention. *Zadvydas*, 533 U.S. at 690.   These rights extend to both "removable and inadmissible" non-citizens. *Zadvydas,* 533 U.S. at 721 (Kennedy, J. dissenting) (holding that both "removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious"); *Rosales-Garcia* v. *Holland*, 322 F.3d 386, 409 (6th Cir. 2003) ("[E]xcludable aliens—like all aliens—are clearly protected by the Due Process Clauses of the Fifth and Fourteenth Amendments.") (citing *Yick Wo* v. *Hopkins*, 118 U.S. 356 (1886)). Petitioner's prolonged detention in this case violates his substantive due process rights, including the right to be free from "inhumane treatment," such as "indefinite, hearingless detention." *Castro* v. *U.S. Dep't Homeland Sec.*, 835 F.3d 422, 449 n.32 (3d Cir. 2016); *see also Zadvydas*, 533 U.S. at 693−94; *Lynch* v. *Cannatella*, 810 F.2d 1363, 1374 (5th Cir. 1987).

132.    The discretionary parole process provided for in 8 U.S.C. § 1225(d)(5)(A) is insufficient to safeguard Petitioner's constitutional rights. Courts have consistently found this statutory provision to be an inadequate substitute for an individualized hearing complying with Due Process. *See Zadvydas*, 533 U.S. at 692 (post-order release procedures insufficient to satisfy due process).   Indeed, Due Process requires that Ramon receive an independent process before an impartial adjudicator where the government bears the burden of proof.

133.    First, only employees and officers of DHS are authorized to make parole determinations; there is no independent entity authorized to grant parole. *See* 8 C.F.R. § 212.5 (listing individuals with authority to grant parole under 8 U.S.C. § 1182(d)(5)(A)). Thus, the only individuals authorized to grant parole under § 1182(d)(5)(A) belong to the same agency tasked with effectuating the parole applicant's detention and deportation.

134.    Second, the denial of a parole request made under 8 U.S.C. § 1182(d)(5)(A) is not subject to judicial review by an Immigration Judge or, to the extent the denial is discretionary, by federal judicial review. *See* 8 U.S.C. § 1252(a)(2)(B)(ii). Thus, the existence of this parole process does not satisfy Petitioner's right to due process. *See Diop*, 656 F.3d at 231 (requiring "an individualized inquiry into whether detention is still necessary to fulfill the statute's purposes of ensuring that an alien attends removal proceedings and that his release will not pose a danger to the community"); *Leslie v. Attorney General of the US*, 678 F.3d 265, 267 at n.2 (3d Cir.  2017) (rejecting as procedurally inadequate a "post order custody review" conducted by DHS, at which neither the respondent nor counsel was present and no hearing was held); *Singh v. Holder*, 638 F.3d  1196, at 1200, 1203 (9th Cir.  2016) (holding that the government "must prove by clear and convincing evidence that an alien is a flight risk or a danger to the community to justify denial of bond" given "the substantial liberty interest at stake") and *Alaka v. Elwood*, 225 F. Supp. 2d  547

at 559 (E.D. Penn.  2002) (rejecting the government's claim that the possibility of parole under §
1182(d)(5)(A) provided adequate due process and holding that "[d]ue process is not satisfied . . .
by rubberstamp denials of release based on a cursory review of an alien's file").

135.     Accordingly, Ramon should not be subjected to prolonged detention without a
meaningful hearing before an impartial adjudicator at which the government bears the burden of
demonstrating by clear and convincing evidence that Ramon is a flight risk or danger to society
such that no amount of bond or conditions of release are sufficient.

136.     Ramon's detention has now exceed six months, and because the parole process is
insufficient to satisfy his due process rights, he is entitled to an immediate individualized bond
hearing before an impartial adjudicator at which the government bears the burden of
demonstrating by clear and convincing evidence that Petitioner is a flight risk or danger to society
such that no amount of bond or conditions of release are sufficient. *See Landon v. Plasencia,* 459
U.S. 21, 34 (1982).

## FIFTH CAUSE OF ACTION:

## RAMON'S DETENETION IS IN VIOLATION OF HIS FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS.

137.     Petitioner re-allege and incorporate by reference each and every allegation
contained in the proceeding paragraphs as set forth fully herein.

138.     The substantive component of due process "bar[s] certain government actions
regardless of the fairness of the procedures used to implement them." *See Daniels v. Williams,*
474 U.S. 327, 331 (1986).

139.     Ramon has now been detained over 180 days. He was detained after being
released to his biological mother pursuant to the TVPRA approximately ten months ago. He was
attending Huntington High School at the time of his detention.   He was 18 years old and had

come to the United States to seek safety. Pursuant to the TVPRA, he was found to be suitable for release and not to be a danger to the community and/or a flight risk.

140.    Prior to 2003, the Immigration and Naturalization Service ("INS") was charged with the care and custody of noncitizen children who were arrested in this country on suspicion of being deportable, and who had no responsible parent or legal guardian. *See D.B. v. Cardall*, 826 F.3d 721, 731-32 (4th Cir. 2016).  The INS, an arm of the Department of Justice, was also responsible for prosecuting removal proceedings against such children in the immigration courts. *Id.* at 732.

141.    In 1985, several children in INS custody initiated a class action in the Central District of California challenging INS policies regarding the detention of alien children. That litigation wound its way through the federal court system—including the Supreme Court, *see Reno v. Flores*, 507 U.S. 292 (1993).

142.    The parties entered into a court-approved settlement agreement in 1997 (the "*Flores* Agreement"). The *Flores* Agreement established a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS." *See*, *Flores* Agreement ¶ 9. The Agreement is binding on all successor agencies to the INS, including ORR.

143.    The *Flores* Agreement spells out a general policy favoring less restrictive placements of non-citizen children (rather than more restrictive ones) and their release (rather than detention). The Agreement contemplates that, unless detention is necessary to ensure a child's safety or his appearance in immigration court, he must be released "without unnecessary delay," preferably to a parent or legal guardian. *See id.* at ¶ 14.

144.    In 2002, Congress passed the HSA, dissolving the INS, and entrusting the "the care and custody of all unaccompanied [alien] children [("UAC")], including responsibility for

their detention, where appropriate," to the HHS, which in turn delegated authority to ORR.  *See* 8 U.S.C. § 1232(b)(1); 6 U.S.C. § 279.  After assuming custody of the UAC, HHS/ORR must "promptly" place the UAC "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A). "In making such placements, the Secretary may consider danger to self, danger to the community, and risk of flight." *Id.*

145.     The Respondents conduct "shocks the judicial conscience" and has resulted in a violation of Ramon's Fifth Amendment Right to substantive due process.  Conduct that shocks the judicial conscience is deliberate government action that is "arbitrary" and "unrestrained by the established principles of private right and distributive justice." *Cty of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Hurtado v. California*, 110 U.S. 516, 527 (1884)).  This strand of substantive due process is concerned with preventing government officials from "abusing their power, or employing it as an instrument of oppression." *Id.* (internal marks omitted).

146.     Despite the fact that Ramon was released to his biological mother pursuant to the requirements of the TVPRA as detailed above, resided with her without incident for 10 months, was attending school,  has never been arrested and/or charged with a crime, denied all gang affiliations and membership,  and is seeking asylum in the United States,  the Respondents, after more than 180 days, have failed to  produce any evidence to support Ramon's detention despite repeated requests by his counsel and appearances before an Immigration Judge.

147.     Ramon's ongoing detention violates his Fifth Amendment Right to substantive due process and therefore he should be immediately released.

### SIXTH CAUSE OF ACTION:

### RAMON'S PROLONGED DETENTION IS IN VIOLATION OF HIS FIFTH AMENDMENT PROCEDURAL DUE PROCESS RIGHTS.

148.     Petitioners re-allege and incorporate by reference each and every allegation

contained in the proceeding paragraphs as set forth fully herein.

149.    First, Ramon's detention on or about October 24, 2017 is suspect.  There is no evidence of any probable cause that a crime had been committed to justify the initial stop.  "The essence of due process is the requirement that "a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it."" *Mathews v. Eldridge*, 424 U.S. 319, 348-49 (1976) (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171-172 (1956) (Frankfurter, J., concurring)). "Particularly where liberty is at stake, due process demands that the individual and the government each be afforded the opportunity not only to advance their respective positions but to correct or contradict arguments or evidence offered by the other." *United States v. Abuhamra*, 389 F.3d 309, 322 (2d Cir. 2004).

150.    Second, no process was provided close in time to Ramon's detention for him to challenge being torn away from his mother, having his liberty restrained, and his education disrupted.  Ramon was not provided with the evidence justifying the detention  Applying the *Mathews* factors, this Court should find that Respondents have violated Petitioner's procedural due process rights, and order Ramon's immediate release.

### SEVENTH CAUSE OF ACTION:

### VIOLATION OF THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION

151.    Petitioners re-allege and incorporate by reference each and every allegation contained in the proceeding paragraphs as set forth fully herein.

152.    The Eighth Amendment prohibits "[e]xcessive bail." U.S. Const. amend. VIII.

153.    The government's categorical denial of bail to certain noncitizens violates the right to bail encompassed by the Eighth Amendment. *See Jennings*, 2018 WL 1054878 at *29 (Breyer, J, dissenting).

154.    For these reasons, Petitioner's ongoing prolonged detention without a bond hearing violates the Eighth Amendment.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that this Court:

1) Assume jurisdiction over this matter;

2) Enjoin the Respondents from transferring the Petitioner from the Southern District of New York;

3) Pending final resolution of this habeas petition, under the Court's inherent powers as detailed in *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001), order the immediate release of Ramon to end the irreparable harm he is suffering in detention, or order a hearing on Petitioner's claims as soon as possible;

4) Issue a Writ of Habeas Corpus and hold a hearing before this Court.  At the hearing before this Court, determine that Petitioner's detention is not justified because the government has not established by clear and convincing evidence that Petitioner presents a risk of flight or danger in light of available alternatives to detention and order Petitioner's release on his own recognizance or under appropriate conditions that take into account Petitioner's ability to pay a bond;

5) In the alternative, issue a Writ of Habeas Corpus and order Petitioner's release within 30 days unless Respondents schedule a hearing before an immigration judge where: (1) to continue detention, the government must establish by clear and convincing evidence that Petitioner presents a risk of flight or danger, even after consideration of alternatives to detention that could mitigate any risk that Petitioner's release would present; and (2) if the government cannot meet its burden, the immigration judge order Petitioner's release on

appropriate conditions of supervision, taking into account Petitioner's ability to pay a bond;

6)  Order Ramon to remain free from civil immigration detention pending the culmination of removal proceedings against him, including all administrative or judicial appeals:

7)  Award Petitioner his costs and reasonable attorneys' fees in this action as provided for by the Equal Access to Justice Act, 28 U.S.C. § 2412, or other statute; and

8)  Grant such further relief as the Court deems just and proper.

Dated: New York, NY
       May 10, 2018

Respectfully submitted,

THE LEGAL AID SOCIETY
Seymour James, Jr., Attorney-in-Chief
Adriene Holder, Attorney-in-Charge, Civil Practice
Hasan Shafiqullah, Acting Attorney-in-Charge,
Immigration Law Unit
Gregory P. Copeland, Supervising Attorney
Sarah T. Gillman, Supervising Attorney
Alina Charniauskaya, of Counsel
Immigration Law Unit
199 Water Street
New York, NY 10038
Tel: 212-577-3356
Fax: 646-616-4356

By:

*/s/ Sarah T. Gillman*
Sarah Gillman, (SG 9273)
Supervising Attorney

ATTORNEYS FOR PETITIONER

## VERIFICATION

I, Sarah T. Gillman, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that, on information and belief, the factual statements in the foregoing Petition for Writ of Habeas Corpus are true and correct.

Dated: May 10, 2018

*/s/ Sarah T. Gillman*
Sarah T. Gillman, Supervising Attorney
THE LEGAL AID SOCIETY
IMMIGRATION LAW UNIT
199 Water Street, 3rd Floor
New York, NY 10038
(212) 577-3356
stgillman@legal-aid.org