UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

RAMON ALBERTO AREVALO LOPEZ,

                         Petitioner,         18 Civ. 4189 (RWS)

    -against-                          OPINION

JEFFERSON B. SESSIONS III, *et al.*,

                         Respondents.

------------------------------------------X

A P P E A R A N C E S:

       Attorneys for Petitioner

       THE LEGAL AID SOCIETY
       199 Water Street, 3rd Floor
       New York, NY 11201
       By:  Sarah T. Gillman, Esq.
            Gregory P. Copeland, Esq.


       Attorneys for Respondents

       GEOFFREY S. BERMAN
       United States Attorney for the
       Southern District of New York
       86 Chambers Street, 3rd Floor
       New York, NY 10007
       By:  Rachael L. Doud, Esq.
            Michael J. Byars, Esq.

**Sweet, D.J.**

Petitioner Ramon Alberto Arevalo Lopez ("Petitioner," "Arevalo Lopez" or "Lopez") has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, 28 U.S.C § 1651, and Article 1 of the U.S. Constitution, arising out of his detention of over 200 days by the Respondents, the Attorney General of the United States, the Secretary of Homeland Security, the New York Field Office Director of the United States Immigration and Customs Enforcement ("ICE"), the Director of the Executive Office for Immigration Review ("EOIR"), and the United States Department of Homeland Security ("DHS") (collectively, the "Respondents"). Based upon the facts and conclusions set forth below, the writ of habeas corpus is granted, and Arevalo Lopez is released to the legal custody of Department of Health and Human Services ("HHS"), pursuant to the Sponsor Care Agreement entered into by the Respondents and Rose America Lopez Lopez ("Lopez Lopez"), the Petitioner's mother.

The principles controlling the outcome of the instant petition are those stated by the Court when addressing new citizens upon their naturalization, that "ours is a government of laws, not of men," and that personal liberty is guaranteed by the great writ of habeas corpus, which "secures every man here,

2

alien or citizen, against everything which is not law, whatever shape it may assume."[1] These principles are applied to remedy what the Court perceives as a lacuna in the statutory scheme controlling the admission and deportation of minor aliens who attain majority after entering the country.

While this action is one of first impression, our sister courts have provided considerable insight, having adjudicated matters involving related, though distinguishable, facts. *See Ramirez v. U.S. Immigration and Customs Enforcement*, No. 18 Civ. 508 (RC), 2018 WL 1882861 (D.D.C. April 18, 2018) (granting preliminary injunction requiring defendants to consider the least restrictive placements pursuant to 8 U.S.C. § 1232(c)(2)(B) where unaccompanied alien children who reached majority while in the physical custody of HHS were transferred to adult detention without consideration of the least restrictive placement); *Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017) (granting habeas relief and preliminary injunction requiring the government to either release

---

[1]    John Adams, Novanglus Papers, No. 7 (1774) (expressing the notion that ours is a "government of laws and not of men," a phrase that was incorporated into the Massachusetts Constitution's Bill of Rights in 1780); Letter from Thomas Jefferson to A.H. Rowan (Sept. 26, 1798)("The Habeas Corpus secures every man here, alien or citizen, against everything which is not law, whatever shape it may assume.").

petitioners or provide a prompt hearing when undocumented minors are released to suitable sponsors by the ORR and subsequently rearrested without probable cause).

## I. **Prior Proceedings**

On May 10, 2018, the Petitioner filed his petition (the "Petition") and an order to show cause seeking a hearing on the Petition. The Petition set forth the facts surrounding the arrival of Arevalo Lopez at age 17 in the United States on December 8, 2016, his detention upon arrival, his release on January 7, 2017 to the custody of his mother as an Unaccompanied Alien Child ("UAC"), his rearrest on October 24, 2017 and detention in the Bergen County Jail to date. The Petition alleges seven causes of action, including: violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(C), by disregarding the requirements of 8 U.S.C. § 1232(a)(2)(b); violation of the Fourth Amendment by unreasonably seizing Petitioner; violation of the Due Process Clause of the Fifth Amendment by failing to provide procedural protections; violation of the Due Process Clause of the Fifth Amendment by detaining Petitioner without review; violation of the Due Process Clause of the Fifth Amendment by engaging in an arbitrary abuse of power; violation of the Due Process Clause of

4

the Fifth Amendment by detaining Petitioner with a lack of probable cause; and violation of the Fifth Amendment by the denial of a right to bail.

The Respondents' return was filed on May 21, 2018, and a hearing was held on May 24, 2018, at which time the Petition was marked fully submitted.

## II. **The Parties**

Arevalo Lopez is a native citizen of El Salvador, born in March 1999. *See* Gov't Return Ex. A (Form I-213) at 1. On December 8, 2016, Arevalo Lopez arrived at the port of entry along the United States-Mexico border at Calexico, California *Id.* He had no visa or other document that would permit his admission into the United States. *Id.* at 2. Lopez told U.S. Customs & Border Protection ("CBP") agents that he wanted to travel to New York to live with his mother after fleeing gang threats in his home country. *See* Pet. Ex. 2, Asylum Application.

At the time of Arevalo Lopez's entry to the United States he was 17 years old and properly designated as a UAC by CBP. Pursuant to the Trafficking and Victims Protection Reauthorization Act ("TVPRA"), Arevalo Lopez was transferred to

the custody of the Office of Refugee Resettlement ("ORR"), which is an office within the HHS. *See* 8 U.S.C. § 1232(b)(3), 6 U.S.C. § 279; *see* Pet. Ex. 3, ORR Verification Letter. Lopez lived with his mother, her partner, and his older brother, Balmore Alexander Reyes Lopez, in Huntington Station, NY until his detention on October 24, 2017.

Respondent Jefferson B. Sessions III is named in his official capacity as the Attorney General of the United States (the "Attorney General"). In this capacity, he is responsible for the administration of the immigration laws as exercised by EOIR. Respondent Kirstjen Nielsen is named in her official capacity as Secretary of Homeland Security in the DHS (the "Secretary"). In this capacity, she is responsible for the administration of the immigration laws. Respondent Thomas Decker is named in his official capacity as the Field Office Director of the New York Field Office for ICE within the DHS (the "Director"). In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations and is a legal custodian of Petitioner.

Respondent James McHenry is named in his official capacity as Acting Director of the EOIR (the "Acting Director").

In this capacity, he is responsible for the administration of
the immigration laws pursuant to 8 C.F.R. § 1003.0(b)(1). He is
responsible for the direction and supervision of the Office of
the Chief Immigration Judge, including the Immigration Courts at
26 Federal Plaza. Respondent DHS is the federal agency
responsible for enforcing Petitioner's continued detention
pending his removal proceedings.

III. **The Facts**

After his arrival at Calexico, on December 9, 2016,
CBP issued a Notice to Appear (the "Notice") placing Arevalo
Lopez in removal proceedings and charging him as removable,
pursuant to Immigration and Nationality Act ("INA") §
212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I), as an
arriving alien who lacked a valid visa. Gov't Return Ex. B.
Notice to Appear. Because Arevalo Lopez was under eighteen years
old, CBP designated him a UAC and turned him over to ORR, an
office within HHS that is responsible for the care and custody
of UACs. Gov't Return Ex. A; Petition Ex. 3. On January 7, 2017,
ORR released Arevalo Lopez into the custody of his mother in New
York pursuant to the *Flores* Settlement, 8 U.S.C. § 1232(b)(3) of
the TVPRA and 6 U.S.C. § 279 (the "Sponsorship Agreement").

For over ten months without incident, Arevalo Lopez lived with his mother, her partner, and his older brother, Balmore Alexander Reyes Lopez, in Huntington Station, New York. He also attended the 9th grade at the Huntington Station High School. *See* Pet. Ex. 1, School Verification Letter. In March of 2017, Arevalo Lopez turned eighteen while living with his mother in Huntington Station, New York. *See* Gov't Return Ex. A (Form I-213). Arevalo Lopez has no criminal history; he has never been charged with a crime in this country or any other. *See* Pet. at 2.

Arevalo Lopez was placed in immigration removal proceedings and attended all of his court dates at 26 Federal Plaza, New York, NY prior to his detention by ICE, on October 24, 2017. He attended his first master hearing at 26 Federal Plaza on August 10, 2017, where pleadings were conducted and his previous counsel indicated that she would be filing a guardianship petition in the Family Court to begin the process for Special Immigrant Juvenile Status and was considering applying for asylum. His next appearance before the Immigration Court at 26 Federal Plaza, New York, NY was scheduled to take place in January 2018. *See* Pet. Ex. 12, Notice to Appear ("NTA").

Arevalo Lopez's mother filed a guardianship petition
on his behalf in the Suffolk Family Court, which was granted on
March 26, 2018. *Id*.

According to Petitioner's counsel, on October 24,
2017, ICE agents came to the Huntington house and asked him to
come to 26 Federal Plaza for an interview Pet. Ex. 8. According
to counsel, Petitioner was questioned about gang membership and
affiliations, which he denied. After questioning he was arrested
and has since been detained at the Bergen County Jail, in its
general prison population. Pet. Ex. 10.

Little evidence has been adduced with respect to the
Bergen County Jail and its population, programs, or facilities.
According to his counsel, Petitioner is held in "in conditions
identical to those of county jail inmates serving criminal
sentences." Pet. at 1. In jail, Arevalo Lopez has suffered
anxiety, fear, and inability to sleep. His development as an
adolescent and his mental health has been affected. Pet. Ex. 9.
Because of distance and resources, his mother has not been able
to travel to the Bergen County Jail. *Id*.

No evidence has been adduced to suggest that a
deliberative process was undertaken with respect to the rearrest

of Arevalo Lopez, other than the issuance of a Form I-200 administrative warrant for arrest. *See* ECF No. 9, Response Memorandum at 4.

On February 26, 2018, counsel for Arevalo Lopez submitted a Motion to Schedule Bond Hearing contending that he is not properly subject to mandatory detention as a UAC, and that even if he was, UACs are afforded special protections and must be released in most circumstances and that he is not a flight risk nor a danger to the community, and that he was entitled to a hearing pursuant to *Saravia v. Sessions*. 17 Civ. 3615 VC, 2017 WL 5569838 (N.D. Cal. Nov. 20, 2017).

On March 1, 2018, at a master hearing, counsel presented these contentions. Immigration Judge Lauren Farber denied the bond request on the ground that as Arevalo Lopez was an arriving alien, she lacked jurisdiction to hold a bond hearing. On March 15, 2018 his parole request was denied.

On March 23, 2018, counsel submitted a Supplemental Argument again arguing that UACs are materially distinct from arriving aliens and, thus, a UAC cannot be designated an arriving alien.

On April 5, 2018, at a master hearing, Judge Farber again indicated that she has no jurisdiction to hold a bond hearing.

On May 7, 2018, Arevalo Lopez filed an application for asylum and withholding of removal.

## IV.  The Applicable Provisions

All issues with respect to immigration, naturalization, admission, and removal of aliens stem from Congressional action undergirded by constitutional requirements.

Congress has established the requirements for admission of aliens that arrive at the border without authorization to enter. *See* 8 U.S.C. § 1225. This regime differs from that which applies to aliens who have lawfully entered the country or who have entered the country without inspection. *See id.* § 1226. Section 1225 provides that aliens who arrive at the nation's borders are deemed "applicants for admission," and must be inspected by an immigration official before being granted admission. *Id.* § 1225(a)(1)(3). Under Section 1225(b), "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be

admitted, the alien shall be detained for a proceeding under
section 1229(a) of this title [i.e., a removal proceeding]." *Id.*
§ 1225(b)(2)(A).

Under this statutory scheme, an immigration judge "may
not" conduct a bond hearing to determine whether an arriving
alien should be released into the United States during removal
proceedings. 8 C.F.R. § 1003.19(h)(2)(i)(B). However, aliens
seeking admission who are detained under 8 U.S.C. §
1225(b)(2)(A) may be released from custody pursuant to DHS's
discretionary parole authority. *See* 8 U.S.C. § 1182(d)(5)(A).
Parole may be granted for "urgent humanitarian reasons" or
"significant public benefit," *id.*, provided the alien poses
neither a security risk nor a threat of absconding. *See* 8 C.F.R.
§§ 212.5(b)-(c). Such parole is entirely at the agency's
discretion and may be revoked at its discretion. *See* 8 U.S.C. §
1182(d)(5)(A).

Before 2002, the care and placement of unaccompanied
alien children in the United States was the responsibility of
the Office of Juvenile Affairs in the former Immigration and
Naturalization Service ("INS"). *See F.L. v. Thompson*, 293 F.
Supp.2d 86, 96 (D.D.C. 2003). In 2002, Congress enacted the
Homeland Security Act ("HSA"). Pub. L. No. 107-296, 116 Stat.

2153. The HSA created DHS, and transferred most immigration functions formerly performed by INS to the newly formed DHS and its components, including the eventually-named U.S. Citizenship and Immigration Services ("USCIS"), CBP, and ICE. *See* Department of Homeland Security Reorganization Plan Modification of January 30, 2003, H.R. Doc. No. 108-32 (2003) (also set forth as a note to 6 U.S.C. § 542).

Congress transferred to ORR, within HHS, the responsibility for the care of UACs "who are in Federal custody by reason of their immigration status." 6 U.S.C. § 279(a), (b)(1)(A). The HSA defined an "unaccompanied alien child" as a child who: (A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom – (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody. *Id.* § 279(g)(2). Congress also transferred to ORR the responsibility for making all placement decisions for UACs and required ORR to coordinate those placement decisions with DHS and ensure that UACs are not released upon their own recognizance. *See id.* § 279(b)(1)(C), (D), (b)(2).

The Trafficking Victims Protection Reauthorization Act ("TVPRA"), which was signed into law on December 23, 2008, required that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services," under whose purview the ORR operates. 8 U.S.C. § 1232(b)(1). It also required that:

> Except in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child.

*Id.* § 1232(b)(3). Under the TVPRA, HHS is responsible for all placement decisions for UACs in its custody, and for conducting suitability assessments pertaining to those placements. *Id.* § 1232(c). It requires that UACs in HHS custody be "promptly placed in the least restrictive setting that is in the best interest of the child," subject to considerations of danger to self, danger to community, and risk of flight. *Id.* The statute limits placement in a secure facility to children who have been determined to pose a danger to self or others or have been charged with crimes. *Id.*

In 1997, the United States entered into a settlement, known as the Flores Settlement Agreement ("Flores" or "*Flores Settlement*"), which established a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS." *Flores v. Sessions*, 862 F.3d 863, 866 (9th Cir. 2017). The Flores Settlement set minimum standards for the detention, housing, and release of non-citizen juveniles who were detained by the government and obliged the government to pursue a "general policy favoring release" of such juveniles. *Id.* The settlement also provided that minors in deportation proceedings would be afforded a bond redetermination hearing before an immigration judge. *Id.* Finally, the settlement defined a "minor" as "any person under the age of eighteen (18) years who is detained in the legal custody of the INS." *Id.* at 869.

In 2013, the TVPRA was amended as to minors who reach the age of eighteen after entry into the U.S., evidencing congressional intent to repeal, in part, 8 C.F.R. § 1003.19 (mandatory detention of arriving aliens). The amendment follows:

> SEC. 1261. APPROPRIATE CUSTODIAL SETTINGS FOR UNACCOMPANIED MINORS WHO REACH THE AGE OF MAJORITY WHILE IN FEDERAL CUSTODY. Section 235(c)(2) the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (8 U.S.C. 1232(c)(2)) is amended – (1) by striking "Subject to" and inserting the following: "(A) MINORS IN DEPARTMENT OF HEALTH AND

HUMAN SERVICES CUSTODY. Subject to"; and (2) by
adding at the end the following: ("B) ALIENS
TRANSFERRED FROM DEPARTMENT OF HEALTH AND HUMAN
SERVICES TO DEPARTMENT OF HOMELAND SECURITY CUSTODY.
If a minor described in subparagraph (A) reaches 18
years of age and is transferred to the custody of the
Secretary of Homeland Security, the Secretary *shall*
consider placement in the least restrictive setting
available after taking into account the alien's danger
to self, danger to the community, and risk of flight.
Such aliens *shall* be eligible to participate in
alternative to detention programs, utilizing a
continuum of alternatives based on the alien's need
for supervision, which may include placement of the
alien with an individual or an organizational sponsor,
or in a supervised group home."

*See* Senate Bill 47, passed into law on Mar. 7. 2013
(emphasis added).


## V.    The Applicable Standard


        Lopez brings this petition for a writ of habeas corpus

under 28 U.S.C. § 2241, challenging the constitutionality of his

detention. Section 2241 "authorizes a district court to grant a

writ of habeas corpus whenever a petitioner is 'in custody in

violation of the Constitution or laws or treaties of the United

States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003)

(quoting 28 U.S.C. § 2241(c)(3)). Federal courts have

jurisdiction to hear habeas corpus claims by non-citizens

challenging the constitutionality of their detention. *Demore v.*

*Kim*, 538 U.S. 510, 516-17 (2003). "[J]urisdiction over [28

U.S.C.] § 2241 [habeas] petitions is properly limited to purely legal statutory and constitutional claims and does not extend to review of discretionary determinations" by immigration judges. *Chen v. United States Dep't of Justice*, 434 F.3d 144, 153 n.5 (2d Cir. 2006) (second and third alteration in original).

Arevalo Lopez argues that he is not properly subject to mandatory detention pursuant to 8 U.S.C. § 1225(b). Section 1225(b) of Title 8 of the United States Code governs the inspection of aliens seeking admission into the United States, a classification sometimes termed "arriving alien." *See* 8 C.F.R. § 1001.1 ("The term arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry."). Section 1225(b)(2)(A) authorizes the detention of arriving aliens if "the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted . . . for a [removal] proceeding under section 1229(a) of this title." 8 U.S.C. § 1225(b)(2)(A).

However, persons under the age of eighteen at the time of entering the United States are subject to a separate regime, maintained by the ORR, within the HHS. Specifically, pursuant to 6 U.S.C. § 279(b)(1), ORR makes all placement decisions

involving UACs to ensure they are not released on their own recognizance. 6 U.S.C. § 279(b)(1)(C),(D),(b)(2). Section 1232(c) of Title 8 of the United States Code, the TVPRA, requires that UACs in HHS custody be "promptly placed in the least restrictive setting that is in the best interest of the child," subject to considerations of danger to self, danger to the community, or risk of flight, and limits placement in a secure facility to children who have been determined to pose a danger to self or others, or who have been charged with crimes. *Id.* Section 1261 amended the TVPRA with reference to UACs who reach the age of eighteen after entering the US, and while "in [HHS] custody." 8 U.S.C. § 1232(c)(2)(B). ("If a minor . . . reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary *shall* consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight.") (emphasis added). The amendment, in full, is set forth above.

## VI. The Writ Shall Issue

The writ of habeas corpus is granted and Petitioner will be released from Bergen County Jail. At least two separate and distinct grounds support this result: First, ICE's arrest of

Petitioner in the absence of process violates both the TVPRA, as amended, and the APA; Second, Arevalo Lopez's deprivation of liberty, without a due process determination, violates the Fifth Amendment's Due Process Clause. The conclusions which follow result in the grant of the great writ of habeas corpus as Petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." *See* 28 U.S.C. § 2241(c)(3).

## a. Violation of the APA

Under the Administrative Procedures Act, a "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. The reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E).

The Supreme Court explained in *Bowen v. Massachusetts* that judicial review of administrative actions "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action" and that any

alternative remedy advanced by the agency will not be adequate under § 704 where the remedy offers only "doubtful and limited relief." 487 U.S. 879, 901 (1988).

Petitioner, while in the custody of ORR, was assessed as neither a danger to himself or others, nor a flight risk, and was accordingly permitted to reside with his mother pursuant to a Sponsorship Agreement entered into by the ORR, on behalf of HHS, on January 7, 2017. Then, on October 24, 2017, without notice, a hearing, or an on-the-record determination, Petitioner was arrested by ICE officials from the Department of Homeland Security. Petitioner has been detained in the Bergen County Jail since that time.

### i. Final Agency Action

Petitioner asserts that his arrest and subsequent detention by ICE in October, 2017 was a "final agency action" reviewable by the Court, and that this arrest resulted in the deprivation of his liberty in the absence of any pre-deprivation notice or opportunity to be heard, in violation of the APA, the Due Process Clause of the Fifth Amendment, and the TVPRA. The Court agrees.

Petitioner's arrest constitutes an agency action because DHS "failed to take a *discrete* agency action that it is required to take" by statute, namely the requirement that it "consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight." *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis original); 8 U.S.C. § 1261. The transfer of custody from the ORR (HHS), under whose supervision Lopez was living while on release during the Sponsorship Agreement, to the DHS, is a particularized agency action that "marks consummation of the agency's decisionmaking process." *See Bennett v. Spear*, 520 U.S. 154, 156 (1997). It is the lack of procedure associated with this agency action—namely the detention of Lopez without consideration of the least restrictive setting—that is the subject of the instant Petition.

As to finality of agency action, the "core question" is "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Lunney v. United States*, 319 F.3d 550, 554 (2d Cir. 2003) (quoting *Dalton v. Specter*, 511 U.S. 462, 470 (1994)).

> As a general matter, two conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decision-making

> process-it must not be of a merely tentative or
> interlocutory nature. And second, the action must be
> one by which rights or obligations have been
> determined or from which legal consequences will flow.

*Bennett*, 520 U.S. at 177-78 (internal quotation marks and

citation omitted). The Supreme Court has provided that "if an

agency has issued a definitive statement of its position,

determining the rights and obligations of the parties, the

agency's action is final notwithstanding the possibility of

further proceedings in the agency on related issues, so long as

judicial review at the time would not disrupt the administrative

process." *Sharkey v. Quarantillo*, 541 F.3d 75, 88 (2d Cir. 2008)

(citing *Bell v. New Jersey*, 461 U.S. 773, 779-80 (1983))

(internal quotation marks and alterations omitted).


As a result of the DHS's failure to consider the least

restrictive setting following Lopez's 2017 arrest, his legal

rights—namely the Fifth Amendment right to procedural, as well

as substantive, due process—have been implicated. Immigration

Judge Farber's denial of Lopez's bond request—and the ICE Office

of Chief Counsel's refusal to reconsider the same—indicates that

the DHS "has completed its decisionmaking process" with regard

to the imprisonment of Lopez. *See Lunney v. United States*, 319

F.3d 550, 554 (2d Cir. 2003); Pet. Ex. 8.

Because DHS detained Lopez without consideration of the least restrictive setting, which would have resulted in release from custody, the agency action implicates Petitioner's liberty. *Id.* (a final agency action is one that "directly affect the parties"). The final agency action by DHS, in arresting Lopez without any procedure or consideration of the least restrictive setting pursuant to the amended TVPRA, is properly before this Court for judicial review under the APA.

### ii. Violation of the TVPRA

Courts reviewing final agency actions "shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise *not in accordance with law.*" 5 U.S.C. §§ 706(2)(A) (emphasis added). Respondents' decision to re-detain Lopez, which transferred him from HHS to DHS custody without consideration of the least restrictive setting, violates the TVPRA as amended (8 U.S.C. §1232 (c)(2)(B)) and defies congressional intent.

Under the amended TVPRA, Lopez fits the statutorily defined group of immigrant children-turned-adults to whom Congress granted additional procedural safeguards. *See* 8 U.S.C.

§ 1232(c)(2)(B) ("Such aliens shall be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives based on the alien's need for supervision . . ."). Section 1232(c)(2)(B)'s consideration of the "least restrictive" setting "shall" be given to UACs who "reach[] 18 years of age and [are] transferred to the custody of the [DHS]." *Id.; see also Jennings v. Rodriguez*, 138 S.Ct. 830, 844 (2018) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.").

While it is clear that Petitioner is, today, in the physical custody of the DHS, the question of whether he was in the "custody" of HHS during the term of the Sponsorship Agreement such that the protections of § 1232(c)(2)(B) apply is one of first impression. It is a question the Court answers in the affirmative.

Although Arevalo Lopez was not in physical custody when he was arrested by DHS in 2017, "custody" need not be limited to a jail cell. *See Jennings v. Rodriguez*, 138 S.Ct. 830, 873 (2004) (KENNEDY, J., dissenting) ("We have long interpreted 'in custody' as not requiring that a prisoner be physically confined."); *Hensley v. Municipal Court, San Jose-Milpitas Judicial Dist., Santa Clara Cty.*, 411 U.S. 345, 349

(1973) (finding, in the habeas context, that "a person released on bail or on his own recognizance" to be "in custody.")

Basic principles of statutory construction require this Court to look first at the plain language of the TVPRA to determine the meaning of "custody" in Section 1232(c)(2)(b). *See Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) (looking first to the "plain language of the statute," and next to its legislative intent and history). The TVPRA, however, provides no definition of "custody." The legislative intent and history must then guide the analysis.

In 2002, Congress passed the HSA, dissolving the Immigration and Naturalization Service, and entrusting the "the care and custody of all unaccompanied [alien] children, including responsibility for their detention, where appropriate," to the HHS, which in turn delegated authority to ORR. *See* 8 U.S.C. § 1232(b)(1); 6 U.S.C. § 279. Senator Kennedy noted the change was intended to provide "comprehensive services to address the special needs of newcomer children . . . tailored to address the[ir] cultural, linguistic, legal, and developmental needs." *Flores v. Sessions*, 862 F.3d 863, 880 (9th Cir. 2017).

The 2013 amendment to the TVPRA requiring the release of UACs who reach the age of eighteen after entry into the U.S. indicates congressional intent to continue to protect vulnerable young people past the age of eighteen.

Congress's intent in amending the TVPRA was to protect and care for minor children, particularly UACs. 8 U.S.C. § 1232(b)(1) ("the *care and custody* of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the [HHS].") (emphasis added). For Section 1232(c)(2)(B) to protect only minors who attain majority while in the physical custody of HHS, but not those over whom the HHS exercises custodial and legal control pursuant to sponsorship agreements, would run counter to the spirit and purpose of the amendment. The protections of Section 1232(c)(2)(B) therefore extend beyond those over whom the HHS exercises physical custody; they apply to UACs who turn eighteen while in the legal custody of the HHS and on release pursuant to sponsorship agreements.

This outcome is especially appropriate because "[a]t least 65 percent of children admitted to [ORR] care are ultimately placed with a sponsor" pursuant to a *Flores*

Settlement."[2] Adopting Respondent's position, that Section 1232(c)(2)(B) only applies to minors who attain majority while in the *physical* custody of HHS prior to DHS transfer, would exclude the majority of UACs from the re-arrest protections of § 1232(c)(2)(B), thus frustrating the clear purpose of the amended TVPRA. *See Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 160 (2d Cir. 2007) ("[I]t is an elemental principle of statutory construction that an ambiguous statute must be construed to avoid absurd results.").

To the extent there is an irreconcilable conflict between § 1232(c)(2)(B) on the one hand, which provides for release of adults who, like Lopez, reach majority while in HHS custody, and 8 C.F.R. § 1003.19(h)(2)(i)(B) on the other, which prohibits immigration judges from conducting bond hearings for removable adults, the latter is impliedly revoked as irreconcilable with, and older than, the former. *See Watt v. Alaska*, 451 U.S. 259, 266 (1981) (recognizing "the maxim of

---

[2] "Approximately two-thirds (65 percent) of children admitted into the agency's [ORR's] custody from October 1, 2008 through September 30, 2010, reunified with a sponsor and proceeded with their legal case in immigration court after release." Olga Bryne & Elise Miller, Ctr. on Immigration & Justice, The Flow of Unaccompanied Children Through the Immigration System: A Resource for Practitioners, Policy Makers, and Researchers, (2012), *available at* http://www.vera.org/sites/default/files/resources/downloads/theflow-of-unaccompanied-children-through-the-immigration-system.pdf").

construction that the more recent of two irreconcilably conflicting statutes governs").

Under Section 1232(c)(2)(B), UACs who live with sponsors under the *Flores* Settlement and the relevant provisions of the TVPRA, are in the "custody" of the HHS, such that the protections of the amendment apply. The TVPRA, as amended, requires DHS to "consider placement in the least restrictive setting" of UACs who attain majority while in HHS custody. 8 U.S.C. § 1232(c)(2)(B). Petitioner, who turned eighteen while on physical release but in legal custody of the HHS, pursuant to a Sponsorship Agreement, was deserving of such protection. The failure of DHS to provide it constitutes a final agency action that is "not in accordance with the law," and therefore violative of the APA. 5 U.S.C. §§ 706(2)(A); *see also Ramirez v. ICE*, 2018 WL 1882861 at *19 (granting injunctive relief to UACs who were transferred from HHS to DHS custody "without considering less restrictive placements in violation of 8 U.S.C. § 1232(c)(2)(B)." Thus, the proper remedy is to hold "unlawful and set aside" the DHS's failure to consider the "least restrictive setting" for Aravelo Lopez. Accordingly, such a consideration is warranted at this point. However, the more comprehensive remedy provided by the writ of habeas corpus, as

granted here and discussed *infra,* obviates the need for such a consideration. 5 U.S.C. §§ 706(2)(A), (E).

## b. **Violation of Due Process**

As Petitioner notes, the Due Process Clause of the Fifth Amendment protects both his substantive due process right to be free from unjustified deprivations of liberty, and his procedural due process right to a neutral forum in which to contest his detention. These rights extend to both "removable and inadmissible" non-citizens. *Zadvydas v. Davis*, 533 U.S. 678, 690, 721 (2001). It is "well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.'" *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)).

Due process requires "adequate procedural protections" to ensure that the government's asserted justification for physical confinement "outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (internal quotation marks omitted). In the immigration context, the Supreme Court has recognized only two valid purposes for

civil detention: to mitigate the risks of danger to the community and to prevent flight. *Id.*; *Demore*, 538 U.S. at 528.

### i.   **Procedural Due Process**

The determination of what procedures are required under the Fifth Amendment requires consideration of: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of that interest through the procedures used; and (3) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

As to the private interest at stake, Arevalo Lopez's interest in freedom from imprisonment "lies at the heart of the liberty protected by the Due Process Clause." Zadvydas *v. Davis*, 533 U.S. 678, 690 (2001). Lopez was deprived of his physical liberty, which had previously been granted to him under the Sponsorship Agreement. The liberty interest is clearly established. *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982)("[L]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action.") (quoting

*Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 18 (1979 (Powell, J., concurring)).

Second, the risk of erroneous deprivation of Mr. Lopez's liberty interest is manifest. The ORR's release of Arevalo Lopez to his mother required a determination that he was neither a danger to himself or others and that it was appropriate for him to reside with his mother under a sponsorship agreement. *See* ECF No. 1-3, UAC Sponsor Care Agreement; *see also Saravia v. Sessions*, 280 F.Supp.3d 1168, 1177 (N.D. Cal. 2017) ("the minor's placement with the sponsor reflects a determination by the federal government that the minor is neither dangerous nor a flight risk"). To date, the only procedure to which Lopez has been afforded was the January 2017 ORR determination that he was "neither dangerous nor a flight risk." *See* ECF No. 1-3, UAC Sponsor Care Agreement.

Lopez's October 2017 re-detention, in the absence of any procedure or evidentiary findings, establishes the risk of erroneous deprivation of a liberty interest. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The January 2017 finding that Lopez was neither dangerous nor a flight risk is irreconcilable with the decision to re-arrest him, absent changed circumstances. Petitioner was detained while living with

an HHS sponsor, with no notice, hearing, opportunity to be
heard, nor a finding of changed circumstances to justify
detention after having previously been found not to be
dangerous.

This risk extends to the broader community of UACs who
are placed with sponsors and are rearrested without process. *See
supra* note 2; *see also Saravia v. Sessions*, 2017 WL 5569838
(N.D. Cal, Nov. 20, 2017) ("Once a noncitizen has been released,
the law prohibits federal agents from re-arresting him merely
because he is subject to removal proceedings.")

Finally, the government's interest in enforcing
immigration laws, promoting border security, and deterring
unlawful immigration cannot be ignored. The Supreme Court has
held that the "government's interest in preventing the entry of
unwanted persons and effects is at its zenith at the
international border." *U.S. v. Flores-Montano*, 541 U.S. 149, 149
(2004) (quoting *U.S. v. Ramsey*, 431 U.S. 606, 616 (1972). This
Circuit has recognized a "compelling" government interest in
maintaining safety and security in the law enforcement context.
*Marcavage v. City of New York*, 689 F.3d 98, 105 (2d Cir. 2012).

In addition to the government's interests in safety, security, and curbing unlawful immigration, *Mathews v. Eldridge* requires consideration of the administrative burdens that would be imposed if the government were required to adopt substitute procedures. 424 U.S. at 335. For Lopez and those similarly situated, a substitute procedure would involve a hearing at which the Government sets forth the basis for its decision to rearrest the person it previously found to be suitable for placement with a sponsor. *See generally* ECF No. 1-3, UAC Sponsor Care Agreement. Such a hearing would take place after the statutorily-required consideration of the least restrictive setting, in accordance with the TVPRA. *See* discussion *supra*.

This substitute procedure would further the government's "compelling" interest in maintaining safety and security, while enhancing its stated administrative interest in "the care and custody of all unaccompanied alien children." 8 U.S.C. § 1232(b)(1). Requiring procedural protections that seek to delineate justifiable detentions from those that are based on mere suspicion or conjecture would allow innocent UACs who are released under *Flores* to maintain their liberty, minimizing the risk of erroneous detention.

Thus, any fiscal or administrative burdens are
outweighed by the benefit of protecting against erroneous
deprivations of liberty—as well as the administrative waste such
deprivations produce. *See Saravia*, 280 F.Supp.3d at 1200.

The "essence" of procedural due process is that a
person risking a serious loss be given notice and an opportunity
to be heard in a meaningful manner at a meaningful time. *Mathews
v. Eldridge*, 424 U.S. 319, 348 (1976). The release of Arevalo
Lopez to his mother was pursuant to a process that involved a
determination that he was neither a danger to himself or others
and that it was appropriate for him to reside with her.
Petitioner's re-detention, without prior notice, a showing of
changed circumstances, or a meaningful opportunity to respond,
does not satisfy the procedural requirements of the Fifth
Amendment. *See Rosales-Garcia v. Holland*, 322 F.3d 386, 409 (6th
Cir. 2003) ("Excludable aliens—like all aliens—are clearly
protected by the Due Process Clauses of the Fifth and Fourteenth
Amendments.") (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

Thus, even if Petitioner was not owed the procedural
protections of the TVPRA discussed *supra* (namely, the right to
be considered for placement in the "least restrictive setting"),
the Fifth Amendment requires more than he was given. Fundamental

principles of due process—specifically, the procedural safeguards of the Fifth Amendment—entitle Lopez to a neutral hearing at which the government presents evidence of changed circumstances requiring redetention.

### ii.    Substantive Due Process

The Due Process Clause of the Fifth Amendment protects the substantive right to be free from unjustified deprivations of liberty. *Zadvydas*, 533 U.S. at 690. This right extends to both "removable and inadmissible" non-citizens. *Id.* at 721 (Kennedy, J. dissenting) (holding that both "removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious"). The "freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" that the Due Process Clause protects. *Id.* at 690; *see also id.* at 718 (Kennedy, J., dissenting) ("Liberty under the Due Process Clause includes protection against unlawful or arbitrary personal restraint or detention.").

According to Petitioner, his prolonged detention, which has lasted over 200 days, violates his substantive due process rights, including the right to be free from "inhumane

treatment," such as "indefinite, hearingless detention." *See* Pet.; *Castro v. U.S. Dep't Homeland Sec.*, 835 F.3d 422, 449 n.32 (3d Cir. 2016); *see also Zadvydas*, 533 U.S. at 693-94; *Lynch v. Cannatella*, 810 F.2d 1363, 1374 (5th Cir. 1987). The Court agrees.

Respondents argue that Lopez's seven-month detention has not been prolonged "in any way," and thus comports with Due Process. *See* ECF No. 9. To support this position, Respondents cite to cases involving the detention of deportable criminal aliens awaiting removal from the United States. *Demore*, 538 U.S. 510, 511 (2003) ("We hold that Congress, justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime . . . may require that persons such as respondent be detained for the brief period necessary for their removal proceedings."); *Doherty v. Thonburgh*, 943 F.2d 204, 211 (2d Cir. 1991) (holding that respondent, a citizen of Ireland who had been convicted by a British court for murder, and who escaped from a British jail before entering the US with a fake passport, was properly held in "prolonged detention without bail pending deportation").

As a threshold matter, this line of cases deals largely with the detention of criminal immigrants under Section

1226(c), a statute which "serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings." *See Demore v. Kim*, 538 U.S. 510, 512 (2003). And Section 1226(c) does not apply to Petitioner, who has never been convicted of, or even charged with, a crime. *See* Pet. P. 2. On the contrary, Lopez was found not to be dangerous by HHS, which also deemed him not to be a flight risk. *See* ECF No. 1-3, UAC Sponsor Care Agreement.

Respondents argue that both the language of 8 U.S.C. § 1225(b)(2)(A), as well as Petitioner's age, subject him to mandatory detention without limitation. ECF No. 9, Response Memorandum, at 9. Section 1225(b)(2) gives the Attorney General discretion to detain arriving aliens "until removal proceedings have concluded." 8 U.S.C. § 1225(b)(2)(A), *Jennings v. Rodriguez*, 138 S.Ct. 830, 834 (2018). Respondents direct our attention to *Jennings*, a recent Supreme Court decision that interpreted Section 1225(b)(2) to permit prolonged detention of arriving aliens pending removal. *See id.* ("It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings...").

If Respondents' position is that *Jennings* deemed prolonged, hearingless detention of removable adult immigrants

constitutional, they are mistaken. The Court did not reach the merits of the constitutional challenge before it, instead holding that there was no *statutorily*-guaranteed right to "periodic bond hearings" under Sections 1225(b) and 1226(c). *Id.* at 836. The Court instead remanded the case to the Ninth Circuit with instructions concerning the statutory requirements of Sections 1225(b) and 1226(c). *Id.* at 851 ("Because the Court of Appeals erroneously concluded that periodic bond hearings are required under the immigration provisions at issue here, it had no occasion to consider respondents' constitutional arguments. . .[and] we do not reach those arguments.")

Respondents also point to 8 U.S.C § 1225(b)(2)(A) to support the position that Lopez lost his status as a UAC—along with the attendant protections—on the day he turned 18, while on release pursuant to the Sponsorship Agreement. ECF No. 9, Response Memorandum. As a result, Respondents argue, Lopez was subject to redetention at any time and for any reason. *Id.* However, that position is in conflict with Congress's intent to extend certain protections UACs who attain majority while in the custody of HHS. *See* discussion of 8 U.S.C. § 1261 *supra* ("If a minor . . . reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary

shall consider placement in the least restrictive setting available").

If UACs become "arriving aliens" on the day they turn eighteen, subjecting them to rearrest and near-indefinite detention, then Section §1232 (c)(2)(B) of the TVPRA would lose the force of law. Adopting Respondents' reading of the relevant provisions would put UACs who are released on sponsorship agreements—after being found neither dangerous nor a flight risk—on equal due process footing as immigrants arriving at the border. They could be rearrested solely on the ground that they are removable—the same basis on which they were detained in the first place. This result is in direct conflict with Congressional intent, constitutional due process, and common sense.

As our sister court, in *Saravia v. Sessions*, recognized on nearly identical facts: "If DHS could, the day after a minor was released to a parent or other sponsor, arrest the minor on the same basis and restart the process, the TVPRA's instruction to place the minor in the least restrictive setting would mean little." 280 F. Supp. 3d at 1197(granting habeas relief and a preliminary injunction requiring the government to either release petitioners or provide a prompt hearing when UACs

are released to suitable sponsors by the ORR and subsequently rearrested without probable cause) (citing *United States v. Kordosky*, No. 88-CR-52-C, 1988 WL 238041, at *7 (W.D. Wis. Sept. 12, 1988) ("the repeated seizure of a person on the same probable cause cannot, by any standard, be regarded as reasonable under the Fourth Amendment")). So too here, where that minor attains majority while in HHS custody.

While parties have not brought to this Court's attention a single case in this Circuit or any other involving these precise facts (civil redetention, without a hearing or probable cause, of an adult immigrant who attains majority during the course of a sponsorship agreement), courts in this Circuit have generally been skeptical of prolonged detention of removable immigrants, without process, lasting over six months. *See Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015) ("In order to avoid the constitutional concerns raised by indefinite detention, an immigrant detained pursuant to 1226(c) must be afforded a bail hearing before an immigration judge within six months") *see also Sajous v. Decker*, 18-cv-2447 (AJN), 2018 WL 2357266, at *11 (S.D.N.Y. May 23, 2018) (granting preliminary injunction in favor of criminal immigrant detained for eight months, because "continued detention of the Petitioner pursuant

to § 1226(c) without access to a bond hearing is unreasonable,
and thus unconstitutional, as applied to him.").

Although the holding in *Lora v. Shanahan* was vacated
by the Supreme Court's ruling in *Jennings*, its reasoning remains
"strong persuasive authority" on this Court. *See Sajous v.
Decker*, 18-cv-2447 (AJN), 2018 WL 2357266, at *11 (S.D.N.Y. May
23, 2018) ("[C]onsistent with the Second Circuit's decision in
*Brown*, the reasoning of *Lora* remains strong persuasive
authority"). In *Lora*, the Second Circuit read into Section
1226(c) a temporal limitation on hearingless detention for
immigrants convicted of certain enumerated crimes. *Id*. It noted
"significant constitutional concerns" surrounding prolonged
detention of criminal immigrants lasting over six months. *Id*.

Since October 24, 2017, Respondents have failed to
provide an explanation for why ICE detained Arevalo Lopez, other
than to state that his arrest was pursuant to a Form I-200
warrant. *See* ECF No. 9, Response Memorandum at 4. Form I-200
does not require any neutral party to evaluate the warrant or
the detention. Both the charging document—the Notice to Appear—
and the Form I-200 warrant are prepared for ICE agents, by ICE
agents, and do not require a showing of probable cause for
arrest. The I-200 in this case, which zeroes in on Petitioner's

clothing and social associations, noting in particular that his "clothing and accessories are indicative of gang membership," does not approach "probable cause." ECF No. 1-3 Such administrative warrants raise serious due process and Fourth Amendment questions when used in this way.

Nor does the discretionary parole process provided for in 8 U.S.C § 1225(d)(5)(A) satisfy Arevalo Lopez's constitutional rights. *See Zadvydas*, 533 U.S. at 692 (post-order release procedures insufficient to satisfy due process).

The authority to grant parole under § 1182(d)(5)(A) belongs to the same agency tasked with effectuating the parole applicant's detention and deportation. In addition, denial of a parole request made under 8 U.S.C. § 1182(d)(5)(A) is not subject to judicial review by an immigration judge or, to the extent denial is discretionary, federal judicial review. *See* 8 U.S.C. § 1252(a)(2)(B)(ii). Thus, the parole process does not satisfy Petitioner's due process rights. *See Diop*, 656 F.3d at 231 (requiring "an individualized inquiry into whether detention is still necessary to fulfill the statute's purposes of ensuring that alien attends removal proceedings and that his release will not pose a danger to the community"); *Leslie v. Attorney General*, 678 F.3d 265, 267 (3d Cir. 2017) (rejecting as

procedurally inadequate a "post order custody review" conducted by DHS, at which neither the respondent nor counsel was present and no hearing was held).

The actions of the Respondents have deprived Arevalo Lopez of his procedural and substantive due process right to liberty. There has been no evidence adduced concerning the process of, or the substantive basis for, Petitioner's redetention. All of Petitioners efforts to seek relief and review have been unsuccessful. The issuance of a writ of habeas corpus is thus the appropriate remedy.

The great writ of habeas corpus, "at its historical core," "has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been at its strongest." *I.N.S. v. St. Cyr.*, 533 U.S. 289, 301 (2001). As the Second Circuit recently stated in *Hechavarria v. Sessions*: "Because a petition for a writ of habeas corpus raises questions of law regarding the power of the state to detain an individual, we conduct a de novo review of the denial." No. 16-1380, 2018 WL 2306595, at *2 (2d Cir. May 16, 2018); *see also Wang v. Ashcroft*, 320 F.3d 130, 139-40 (2d Cir. 2003).

Arevalo Lopez has suffered constitutional and statutory violations as a result of his prolonged re-detention without process. It is now appropriate to restore him to his pre-detention status which was previously approved by HHS. A birthday shall not result in detention.

In light of the deprivation of Arevalo Lopez's liberty, formerly granted and approved by Respondents, the absence of any deliberative process prior to, or contemporaneous with, the deprivation, and the statutory and the constitutional rights implicated, a writ of habeas corpus is the only vehicle for relief. It is, in essence, the most appropriate remedy.

Thus, because the parole process is unavailing as discussed *supra*, and because the agency actions here are final and in violation of Petitioner's statutorily and constitutionally-guaranteed right to be free from deprivations of liberty without process, the Petition is granted.

In the event that facts are presented which require a reevaluation of the Sponsor Care Agreement, the applicable process under 8 U.S.C. 1232(c)(2)(B) should be followed.

## VII. Immediate Release Under *Mapp v. Reno* is Denied

The Petitioner has sought immediate release of Arevalo Lopez under the authority of *Mapp v. Reno.* 241 F.3d 221 (2d Cir. 2001). *See also Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 153 (2d Cir. 2007) (explaining the REAL ID Act of 2005 "did not qualify out inherent authority to admit to bail petitioners in immigrations cases").

Pursuant to *Mapp v. Reno*, a "court considering a habeas petitioner's fitness for bail must inquire into whether the habeas petition raises substantial claims and whether extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective." 241 F.3d at 230 (internal quotation marks and alterations omitted). This standard is "a difficult one to meet." *Id.* at 226 (citation omitted). Arevalo Lopez's Petition has not established the existence of "extraordinary circumstances . . . that make the grant of bail necessary to make the habeas remedy effective." *Id.* at 130; *see also id.* at 231 (reversing district court's grant of bail because "the effectiveness of [the relief the petition sought] is wholly independent of the question of whether [he] is incarcerated" while seeking relief). This is particularly true here, given the relief granted by the writ.

# VIII.   Conclusion

The Petition of Arevalo Lopez is granted, and he is released under the terms of the Sponsorship Agreement.

Immediate release under *Mapp* is denied.

It is so ordered.

New York, NY
June 1?, 2018

ROBERT W. SWEET
U.S.D.J.